HIBDON v. MOYER et al. (No. 734.)

(Court of Civil Appeals of Texas. El Paso. Oct. 18, 1917.)

1. LIBEL AND SLANDER ⬤➡15—LIBEL PER SE —PUBLICATION.

An article entitled "Misstatements or (?)," and charging untruthfulness, is libelous per se.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Libel.]

2. LIBEL AND SLANDER ⬤➡33 — EVIDENCE— SPECIAL DAMAGES.

Under Rev. St. 1911, art. 5595, defining libel as a defamation expressed in printing or writing tending to injure the reputation of one who is alive, and thereby expose him to public hatred or to impeach his honesty, etc., and thereby expose such person to hatred, ridicule, or financial injury, an article being libelous per se, in that it charged plaintiff with untruthfulness, it was unnecessary for plaintiff to offer evidence of special damages to authorize recovery.

3. LIBEL AND SLANDER ⬤➡16 — CHARGING NATURAL DEFECT—EXPOSURE TO RIDICULE.

Accusing one of having "brainstorms," even if not libelous per se, is a charge of a natural defect, and exposes the one accused to ridicule.

4. LIBEL AND SLANDER ⬤➡119—MENTAL SUFFERING—STATUTE.

Damages for mental anguish caused by publication of matter actionable under Rev. St. 1911, art. 5595, defining libel is recoverable regardless of whether there was any other injury or damage.

Appeal from District Court, Eastland County; Thos. L. Blanton, Judge.

Suit by John Hibdon against E. J. Moyer and others. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

J. R. Stubblefield, of Eastland, and Ben Palmer, of Pecos, for appellant. J. A. Buck and Ross & Hubbard, all of Pecos, and Scott & Brelsford, of Eastland, for appellees.

HIGGINS, J. Hibdon, appellant, the editor and owner of "The Enterprise," a newspaper, brought this suit against the editor and owners of "The Pecos Times," another newspaper, to recover damages alleged to have been sustained by the publication in the last-named paper of an alleged libelous article. The article is headed thus, "Misstatements or (?)," and reads thus:

"A number of friends of the Editor and of The Times have asked why we ignore the attacks of the Enterprise from week to week. It's simple; in the first place, we do not intend to prostitute the columns of this paper by replying to such baseless statements that he sees fit to publish; secondly, we know that our readers do not care to be bored by this kind of whimpering prattle. Another thing: Were he to confine himself to the mere borders of that lofty virtue, truth, we might possibly have had cause to plead justification. This, however, he persistently refuses to do. So, gentle reader, do not worry. We do not intend to feed your minds on such vituperations from week to week, for this is our first and last answer to the Enterprise (?).

"In last week's issue he saw fit to attack our circulation, and every point he sought to gain was approached by a misrepresentation. We know not, nor do we care, who his informant was or is—he undoubtedly was at one time connected with The Times—but whoever it was, he did not know the facts. This we can prove.

"He says that three-fourths of our circulation goes out of the state of Texas. Well, if it did, we would feel a just pride in the fact, for what good is a newspaper if it does not preach the gospel of its town and community; and how can it thus preach it unless it goes forth? But such is not the truth. We print for circulation (bona fide subscribers) 1,200 copies weekly—300 to Pecos City alone, and if it does not enter all families of the city of Pecos our population figures wrong. In the territory from which our merchants draw a big per cent. of trade we have 684 subscribers, while in the state of Texas we number valuable readers an even 800. The remainder are scattered over the United States, including nearly every state, Canada, Costa Rica, South America, and one Korea, in Asia.

"Now, we firmly call the gentleman's hand and ask that he produce the proof that three-fourths of our circulation goes out of the state.

" 'The Times is forced upon its readers,' or words to that effect, is what he insinuates. This, besides being unkind and underhanded, is false. Our paper is forced upon no one. Our policy since taking charge on the 1st day of January, this year, has been to take off every name when notified that the paper is no longer desired. We are glad to state that this happens but seldom. We possibly could say something along this line in regard to a certain paper that made its debut in Pecos recently, but right now we are defending our own position, not condemning that of others.

"He says, 'The Enterprise is also able to give you "publicity" among the better class.' This phrase is an enigma to us. We doubt not that the Enterprise numbers among its readers some of our best citizens, friends of both papers; but if this sentence is meant to cast reflection on our readers, and relegate them to a lower class of mortals, we give the gentleman the lie direct.

"He says the advertisers are entitled to know certain things. We indorse this statement from the bottom of our heart. They know our large circulation, and that they recognize its value to them is evidenced by one little glance through our columns. Numbers is what they want, and The Times can produce this feature.

"Every advertisement in The Times is contracted for, and all are treated alike. We are prepared to prove this, too.

"But there is one thing that Pecos business men might possibly be interested in if they're anxious to be treated square by a man they

---

⬤➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

are helping. It is this: On the editorial page of the Enterprise is the legend: 'Display advertising, 12½ cents per column inch; readers 5 cents per line each insertion.' We do not doubt that he has been collecting this amount from his home advertisers, but the next time ask him how much he collects from foreign advertisers that occupy space in his paper weekly. Last week 107 (low approximate) inches of patent medicine advertising, also ads. of Post Toasties and Castoria in big display, and he is running these from week to week *absolutely free.* Why? It strikes us that if any discrimination is to be made by a home enterprise, it should be in favor of home people. For all advertising out of this vicinity The Times has a written contract, and our own people can have and have had space at the same rates, the only difference being that we do not require written contracts from them—in other words, our confidence in them is supreme. This, we feel, will be news to some of the advertisers who are paying hard dollars while foreign advertisers pay nothing for Enterprise space.

"Somewhere in the good book is a saying about motes and beams; we respectfully advise our contemporary a careful perusal of same. We fear, though, like everything else, he would misunderstand.

"Another thing calling forth brainstorms from this gentleman is the ownership of The Times. What gets our nanny is, what's he going to do when he finds out.

"Now, friends, we have only glided over the surface of this subject, the above being merely a defense and a comparison. It's our first offense and will be our last, unless extenuating circumstances arise, for, in future, we shall wholly ignore such ungentlemanly efforts to disparage a paper whose efforts for nearly 30 years has been for the uplift and prosperity of the town and the men who support it by a liberal patronage."

The article appeared in the issue of May 12, 1916.

A peremptory instruction to find for defendants was given, in accordance wherewith verdict was returned and judgment rendered.

[1] The article unquestionably charges appellant with untruthfulness. This being its nature, it is libelous per se. Fleming v. Mattinson, 52 Tex. Civ. App. 476, 114 S. W. 652; Democratic Pub. Co. v. Jones, 83 Tex. 307, 18 S. W. 652; Mitchell v. Spradley, 23 Tex. Civ. App. 43, 56 S. W. 134; Knapp & Co. v. Campbell, 14 Tex. Civ. App. 199, 36 S. W. 765.

We cannot agree with appellee's contention that appellant has admitted the truth of this libelous matter and that this warranted the peremptory instruction.

[2] The article being libelous per se in the particular indicated, it was unnecessary for plaintiff to offer evidence of special damage in order to authorize a recovery. Bailey v. Chapman, 15 Tex. Civ. App. 240, 38 S. W. 544; Belo & Co. v. Smith, 40 S. W. 856.

Furthermore, the rules of the common law were altered by article 5595, R. S. 1911. In Guisti v. Galveston Tribune, 105 Tex. 497, 150 S. W. 874, 152 S. W. 167, Judge Dibrell, in construing this article said:

"It is immaterial that the publication complained of is not libelous per se; it is libelous and actionable, nevertheless, if by such innuendoes as may not extend but simply explain the effect and meaning of the language used and the identity of the person libeled, the publication is of such character as tends to injure the reputation of plaintiff and expose her to public hatred, contempt, or ridicule, or tends to impeach her honesty, integrity, virtue, or reputation. * * * We think it clear that in the enactment of the law the purpose was not only to make definite what constitutes actionable libel in this state, but to materially modify the doctrine of the common law upon that subject. By the terms of the present law, a libelous publication, contrary to the common-law rule, becomes actionable without the proof of malice, whether it is or not libelous per se. Under the present law, it is not necessary to the right to maintain an action for a publication not libelous per se to allege or prove special damages. Walker v. San Antonio Light Pub. Co., 30 Tex. Civ. App. 165, 70 S. W. 557. In this particular the common-law rule has been modified. Again, at common law, where the libel was not actionable per se, damage for mental anguish was recoverable, if at all, only when proof had been made of other injury or damage, but the contrary is the rule under the present law."

[3] The article implies that plaintiff is subject to "brainstorms." This clearly implies an uneven mental balance, and its usual significance is derisive. It is immaterial, under the authority last quoted, whether or not it is libelous per se. To accuse plaintiff of having "brainstorms" is the publication of a natural defect and exposes him to ridicule.

[4] Damages for mental anguish caused by the publication of matter actionable under the article is recoverable regardless of whether there was any other injury or damage. Guisti v. Galveston Tribune, supra.

The peremptory instruction was improperly given. Reversed and remanded.