Hugh TAYLOR, Appellant,

v.

**HOUSTON CHRONICLE PUBLISHING CO.,**
Appellee.

No. 15775.

Court of Civil Appeals of Texas,
Houston (1st Dist.)

Rehearing Denied Nov. 11, 1971.

Second Rehearing Denied Dec. 2, 1971.

Brown, Kronzer, Abraham, Watkins &
Steely, Houston, Don Riddle, Ernest H.
Cannon, W. James Kronzer, Houston, of
counsel, for appellant.

Liddell, Sapp, Zivley & Brown, W. Rob-
ert Brown, Glen E. Clover, Houston, for
appellee.

On Motion for Rehearing

COLEMAN, Justice.

The opinion of this court announced on
October 7, 1971 is hereby withdrawn and
this opinion is substituted therefor.

This is a suit for damages. The cause of
action arose from statements published in
the Houston Chronicle on January 14 and
January 19, 1966, which are alleged to be
false and libelous. At the conclusion of the
evidence the trial court withdrew the case
from the jury and rendered judgment for
the defendant. The principal issue relates
to whether the published statement was
libelous.

Hugh "Bones" Taylor was the head foot-
ball coach of the Houston Oilers pro-
fessional football team during the 1965
season. The team won all of its exhibition
games, but during the regular season play
won four games while losing eight. George
Blanda was a veteran quarterback on the
Oiler team and had previously led the
team during two winning seasons. Don
Trull was a relatively inexperienced quar-
terback, but had divided time as quarter-
back with Blanda during the 1965 season.
There had been considerable discussion of
the Oiler quarterbacking situation by
sportswriters in the Houston newspapers
during the season. Bud Adams was the

owner of the franchise. At the last season game in December, 1965, he announced that Hugh Taylor had been given a new three year contract.

On the morning of January 13, 1966, at a press conference, it was announced that Don Klosterman had been hired as General Manager of the Houston Oilers. Immediately after the press conference Wells Twombly, a sportswriter and columnist for the Houston Chronicle, had an interview with Hugh Taylor at which Chris Chandler, a television sports announcer for KPRC–TV, Channel 2 in Houston, was present. Following the interview Twombly wrote a story for publication in the Houston Chronicle in which he stated that Hugh Taylor had asked owner Bud Adams either to trade George Blanda to another club or to buy up the year remaining on Blanda's contract and release him. He also stated that Taylor put his request to Adams on a "him or me" basis. He quoted Taylor as saying: "I know this: one of us won't be back next year. . . . You can't let a player dictate to you . . . I don't plan to take it from George Blanda."

This story was presented to an editor on the 13th of January, and he suggested to Twombly that it be held until he could get the reaction of George Blanda for incorporation into the story. On the morning of the 14th Twombly and Dick Peebles, the sports editor of the Chronicle, talked to Blanda. Blanda's statements were included in the story and it was printed in several editions of the paper on that day. The story quoted Blanda as saying he was shocked by Taylor's attitude.

The same day this article appeared in the Chronicle Chris Chandler commented on it in his sports broadcasts over KPRC–TV. He stated that ". . . the gist of the article is untrue because I sat in that conversation and heard every bit of it, and Mr. Taylor did not even indicate, much less say, that it was 'Blanda or me'." He said that Taylor stated that he was going to use Blanda during the next season as the

team's kicker, a quarterback and an assistant coach.

The following morning, at the invitation of Don Klosterman, Taylor, Twombly and Chandler gave their versions of the interview at a meeting at which Dick Peebles was present. Both Taylor and Chandler denied the accuracy of the quotations attributed to Taylor in the Twombly story to the effect that Blanda would not play for the Oilers and that it was a "Blanda or me" situation.

On Tuesday, January 18, 1966, Don Klosterman announced that Taylor's contract as a coach for the Oilers would not be renewed after January 31, 1966. The Oiler press release contained this statement:

"Klosterman indicated that this decision was made primarily as a result of recent news media commentary indicating an apparent inharmonious relationship existing between Coach Taylor and Oiler Quarterback George Blanda in which certain statements were attributed to both parties involved creating an atmosphere not conducive to a winning football team."

On January 19, 1966, the Chronicle ran another front page story written by Twombly in which the following statement appeared:

"Earlier in the week, Taylor had said either he or the veteran quarterback George Blanda would have to leave the Oiler organization next season."

The article also stated:

"He (Taylor) felt so secure in his job only last week that he talked vehemently—for publication—about the possibility of trading Blanda to another club. It was put on a 'him or me' basis. However Edwin Pope, Assistant Sports Editor and columnist for the Miami Herald told Klosterman that he had been told the same thing about Blanda by Taylor at the Sugar Bowl Game last month.

"Taylor said that he had never denied making the remarks about Blanda."

In his column appearing in the sports section of the same edition of the paper under the heading "What the Man Said", Twombly again discussed the previous interview commenting that it seemed that Taylor wanted the story to get out at last, mainly because he subconsciously desired a showdown between Blanda and himself. He referred to several previous instances when Taylor had stated that "either he or Blanda wouldn't be back in 1966." At the trial Taylor denied making these statements. None of the alleged statements resulted in news stories prior to January 14, 1966.

Twombly testified that during the 1965 season he saw no evidence of friction between Blanda and Taylor.

Libel is defined by Article 5430, Vernon's Ann.Civ.St., as being "a defamation expressed in printing or writing, * * * tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, * * * and thereby expose such person to public hatred, ridicule, or financial injury."

The Supreme Court of Texas considered this statute in Guisti v. Galveston Tribune, 105 Tex. 497, 150 S.W. 874 (1912), and stated with reference thereto:

"By the express terms of the article of the statute above quoted, in so far as it relates to the case at bar, any written or printed publication tending to injure the reputation of any person alive and thereby expose him to public hatred, contempt, or ridicule, or tending to impeach the honesty, integrity, virtue, or reputation of such person, is a libel. * * *

"By the terms of the present law, a libelous publication, contrary to the common law rule, becomes actionable without the proof of malice, whether it is or not libelous per se.

"Under the present law, it is not necessary to the right to maintain an action for a publication not libelous per se to allege or prove special damages. * * *

" * * * the manifest purpose of the Legislature in enacting this law was to cover the entire subject of libel as applied to civil actions, without regard to the rules of the common law and holding of the courts on the subject, and to materially enlarge the rights of those who may be the subject of libelous publications."

In Bell Publishing Co. v. Garrett Engineering Co., 141 Tex. 51, 170 S.W.2d 197 (1943), the court cites in support of its decision Missouri Pac. R. Co. v. Richmond, 73 Tex. 568, 11 S.W. 555; 27 Tex.Jur. p. 602, sec. 10, and Restatement of the Law (Torts), sec. 569.

In the Richmond case the court accepted as a correct rule of the law of defamation (quoting Townshend, Sland. & Lib., 182), that language which concerns a person engaged in a lawful occupation "will be actionable, if it affects him therein in a manner that may as a necessary consequence, or does as a natural or proximate consequence, prevent him deriving therefrom that pecuniary reward which probably he might otherwise have obtained."

In 36 Tex.Jur.2d, § 18, the text reads:

"Malicious and false publication of statements that are reasonably capable of conveying an injurious meaning or producing an injurious effect and that relate to the capacity, reputation, and standing of the plaintiff personally in his business is actionable when pecuniary injury actually follows as the probable and natural result of the words. And words not otherwise actionable per se sometimes become so if spoken of a person engaged in a particular business or profession, where they charge him with fraud, indirect dealings, or incapacity, and tend to injure him in his trade or business . . ."

Libel is defined in § 568, Restatement of the Law (Torts): "Libel consists of the publication of defamatory matter by written or printed words . . . ." § 569, supra, reads: "One who falsely, and without a privilege to do so, publishes matter defamatory to another in such a manner as to make the publication a libel is liable to the other although no special harm or loss of reputation results therefrom." Comment e under this section states that the publication in writing of matter attributing to one conduct or characteristics incompatible with the proper conduct of his lawful trade or profession is a libel, and that it is enough that the defamatory matter impute any misconduct whatever in the conduct of his calling, although the charge "does not necessarily imply that want of skill, learning or competence which the public reasonably demands of those who carry on a trade, business, or profession . . . ."

In McCullagh v. Houston Chronicle Publishing Co., 211 F.2d 4 (5th Cir. 1954), the court states:

"Libel in Texas has an exclusive statutory definition. * * * The courts of Texas have construed said statute to mean that there can be no libel unless the publication claimed to be libelous be a defamation tending to injure or impeach the reputation of the person claimed to have been libeled. * * * "

This court, in Houston Chronicle Pub. Co. v. Thomas, 262 S.W. 243 (Tex.Civ. App.—Galv.1924, writ ref.), said:

"It is well said by our Supreme Court in the case of Belo v. Smith, 91 Tex. [221] 225, 42 S.W. [850] 851, in discussing the question of when language should be held libelous:

" 'The question is, what effect would the publication have upon the mind of the ordinary reader? What construction would he have put upon it? For in defamatory language, it is not so much the idea which the speaker or writer intends to convey, as what he does in fact convey.

It is the effect upon the character of the person alleged to be defamed by the utterance which the law considers, and therefore the utterer uses the language at his peril.'

"But this is only true when the language used is susceptible of defamatory meaning. The law is well settled that unless the language used is reasonably susceptible of a defamatory meaning it cannot form the basis of a charge of libel."

"A civil action for the recovery of damages for libel lies because the law makes reputation, as a part of the right of personal security, one of the objects of its protection." Renfro Drug Co. v. Lawson, 138 Tex. 434, 160 S.W.2d 246 (1942).

"Libel is defined by statute. * * * Under this definition there can be no libel unless the publication claimed to be libelous be (1) a defamation (2) tending to injure or impeach the reputation of the person claimed to have been libeled. It results, therefore, that not all false statements which cause financial injury are libelous. * * * " Snider v. Leatherwood, 49 S.W.2d 1107 (Tex.Civ.App.— Eastland 1932, writ dism'd).

There is evidence that the Houston Chronicle printed stories, which were false, clearly conveying to the ordinary reader the impression that the relationship between Taylor, the coach of the Houston Oilers, and Blanda, the quarterback for the team, had become so inharmonious that both of them could not remain on the team; that the trouble arose over attempts of the player to dictate to the coach; that Taylor had informed Mr. Adams, the owner of the club, that if Blanda remained with the club, he would not remain with the club; and that by reason of the publication of these articles Taylor had suffered financial injury.

The action for libel was sustained by the evidence if the statements considered in context were defamatory, and were not privileged. While the publication of the

statements attributed to Taylor and Blanda may well have created an "atmosphere not conducive to a winning football team," the crucial question is whether the statements concerning Taylor tended to injure his reputation as a football coach, and thus were defamatory. If the language used is not reasonably capable of a defamatory meaning, it is not libelous. The language alleged to constitute libel must have tended to injure the reputation of Hugh Taylor as a football coach. The meaning attributed to the language is not doubtful. Financial injury did result. Bell Publishing Co. v. Garrett Engineering Co., 141 Tex. 51, 170 S.W.2d 197 (1943); Southern Publishing Co. v. Foster, 53 S.W.2d 1014 (Tex.Com.App.1932); Rawlins v. McKee, 327 S.W.2d 633 (Tex.Civ.App.—Texarkana 1959, writ ref'd, n. r. e.); Herald-Post Publishing Company v. Hervey, 282 S.W.2d 410 (Tex.Civ.App.—El Paso 1955, writ ref'd, n. r. e.); Houston Printing Co. v. Hunter, 105 S.W.2d 312, aff'd 129 Tex. 652, 106 S.W.2d 1043.

■ The language used in the publications complained of is not ambiguous. It was the duty of the trial court to determine whether it was libelous or not. In determining this question "the words used in the publication must be construed as a whole, giving to all the words contained therein their ordinary meaning as read and construed by persons of ordinary intelligence." Southern Publishing Co. v. Foster, supra; Gartman v. Hedgpeth, 138 Tex. 73, 157 S.W.2d 139 (1941):

■ The language used in the publication made the basis of this action was not reasonably capable of a defamatory meaning. Reasonable minds cannot differ as to the effect of the words used on the reputation of Hugh Taylor as a football coach. A reasonable man would not say that his reputation as a coach was injured by the fact that he determined and stated that he would not coach a team on which a certain man played, but that he would continue to coach the team if the player was traded or paid off. Such a statement rather portrays a man with convictions and the courage to back them up with action. The trial court did not err in withdrawing the case from the jury and entering a judgment for appellee. Newton v. Dallas Morning News, 376 S.W.2d 396 (Tex.Civ.App.—Dallas 1964).

Motion for rehearing overruled.

Affirmed.