John RAYMER, Plaintiff-Appellant,

v.

DOUBLEDAY & CO., INC., Thomas
Thompson et al.,
Defendants-Appellees.

No. 78–2068.

United States Court of Appeals,
Fifth Circuit.

April 8, 1980.

Frank L. Supercinski, Longview, Tex., for plaintiff-appellant.

Lorance, Thompson & Wittig, Tom Lorance, Houston, Tex., for Thomas Thompson.

Satterlee & Stephens, Robert M. Callagy, John T. Schmidt, New York City, for Doubleday & Co., Inc.

Before HILL, KRAVITCH and THOMAS A. CLARK, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellant John Raymer brought suit against Doubleday & Company, Thomas Thompson, and North Branch Road Corp., alleging that he had been defamed by Chapter 35 of the book *Blood and Money*. The district court granted summary judgment as to Doubleday (the publisher) on the ground that Raymer is a public official and there was no evidence of "actual malice" on the part of the publisher. Partial summary judgment was granted as to Thompson (the author) and North Branch Road Corp. (holder of the copyright) on the grounds that all but one of the complained of passages were not defamatory as a matter of law. The case proceeded to trial with only one passage at issue. The jury returned a special verdict reflecting its decision that the passage was not defamatory. Because we hold that the trial court was correct in its decision that all but one of the passages are not defamatory as a matter of law, and that there is sufficient evidence to support the jury finding that the final passage is not defamatory, we need not reach the question of whether Raymer was a "public official" so as to trigger the *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), standard of proof.[1]

*Blood and Money* is a nonfictional account of the deaths of Joan Robinson Hill and her husband, Dr. John Hill, two prominent Houston residents. The deaths were widely reported and aroused substantial public interest. Following the death of Mrs. Hill, Dr. Hill was charged with her murder. Dr. Hill's trial ended in a mistrial due to a deadlocked jury, and, while awaiting retrial, he was murdered. It was suspected that Joan Hill's father paid one Lilla Paulus, who in turn hired Bobby Vandiver, to murder Dr. Hill. Vandiver confessed to the murder and became a State's witness in the Hill murder case, but while free on bail was shot and killed by police officer John Raymer while resisting arrest. Chapter 35 describes the circumstances surrounding the

---

1. If the statements were defamatory, in whole or in part, we would have to decide whether or not Raymer is a "public official." If he is then *New York Times v. Sullivan* requires him to prove the statements were made with "actual malice" in order to recover.

Vandiver shooting, and is the book's first and presumably last reference to Raymer.

Tex.Civ.Code Ann. tit. 88, § 5430 defines libel as:

a defamation expressed in printing or writing, or by signs and pictures, or drawings tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, or to publish the natural defects of any one and thereby expose such person to public hatred, ridicule, or financial injury.

Evaluating the passages complained of under that statute, we find the district court did not err in deciding that, as a matter of law, only one passage could survive the defendants' motion for summary judgment.

### Statements Relating to Plaintiff's Physical Attributes

■ Chapter 35 begins:

If ten men were standing in a row, John Raymer would be the one to whom the least attention was paid. With a tendency to flush red when angry or engaged in spirited work, John Raymer's round face, with a disappearing fringe of hair at the crown, resembled a hard-boiled egg. A few more pounds and he would be roly-poly, like a rubber beach toy that bounces up every time it is knocked to the sand, but there was little about him to mark him as someone to remember.

Raymer contends this is defamatory because it is a publication of his "natural defects" and exposed him to public ridicule as such. There is only one Texas case concerning "natural defects," and it is not helpful in interpreting the term. In *Hibdon v. Moyer*, 197 S.W. 1117 (Tex.Civ.App.1917), the Texas court held that accusing someone of having "brainstorms" is actionable because it amounts to an allegation of mental imbalance, and thus is a publication of a natural defect.

While mental imbalance may be a "natural defect," baldness and pudginess hardly qualify. Moreover, the statement that Raymer resembled a "hard-boiled egg" does not constitute publication of a natural defect. It is merely a literary description of the author's impression designed to create for the reader an immediate mental picture of the character. The court properly granted summary judgment on this passage.

### Statements Relating to Plaintiff's Background

■ The opening introduction to Raymer continues:

In the spring of 1974 he was almost half a century old, short, portly, prudish-looking and well accommodated to the fact that he had made but slight scratches on the face of the earth. Even his continuing ambition, to obtain a college degree through endless years of night study, was carried on not in hopes of writing a great poem or to illumine his relationship in the family of man. He did not expect to light historic fires at the age of forty-nine when and if he ever received his Bachelor of Police Science degree from Tyler State College. All John Raymer wanted was a shot at a better-paying job, perhaps one with the Texas parole board or another government agency that required a diploma. He could use another hundred dollars a month, maybe to slip a few bucks to the kids and the grandkids and, if any was left, to sustain his only real indulgence, the bass rig that bore him into the still, deep lakes of East Texas. John Raymer was relentlessly small town in fashion and horizon, and he knew it and would have it no other way.

We fail to see how such a statement could be construed to be libelous under the Texas libel law; therefore summary judgment was proper.

### Statements Relating to "Vicki"

■ In the fourth paragraph of Chapter 35, Thomas Thompson wrote:

While the cop [Raymer] drank his coffee, the new waitress, Vicki, went over and

put her arm around "J.C." She was half a head taller than he, and she struck Raymer as a sexless, vacant girl. "Well, she won't last long with him," Raymer thought to himself. "These old boys swap these girls back and forth like used cars."

Raymer contends this implies that he looked at Vicki in a "sexual manner," and thus, presumably, impeaches his virtue. As a matter of law, such an inference cannot be derived from a fair reading of the passage.

### Statements Suggesting Raymer Murdered Vandiver

Raymer argues that the description of the killing of Vandiver suggests that Raymer was acting other than in self-defense. We find this contention singularly unpersuasive.

■ The description of the shooting is set out in the footnote.[2] The statement specifically complained of is the characterization of Raymer as "the police executioner."

Raymer contends the use of the term "executioner" implies that he murdered a defenseless person. That statement must be read in context, however, *Taylor v. Houston Chronicle Publishing Co.*, 473 S.W.2d 550 (Tex.Civ.App.1971), and in context, the shooting was clearly in self-defense. Because the passage is unambiguously non-defamatory, there was nothing to submit to the jury. *Deen v. Snyder*, 57 S.W.2d 338, 341 (Tex.Civ.App.1932).

### Statement Suggesting Raymer Had Been Hired to Kill Vandiver

■■ In a spurious attempt to force the court to find a defamatory statement somewhere in the chapter, Raymer quotes the following passage, arguing it implies he had been hired to kill Vandiver:

Of course it occurred to Bennett that Bobby might have been killed by contract. A lot of people would pass their nights more comfortably with the state's star witness in a grave. But after an investigation was conducted, after John

2. Unhesitating, Raymer walked to the pool table where a low-hanging yellowish light illumined but half of Bobby Vandiver's lean body. He held a pool cue in his hand. He was leaning over the green felt when Raymer's words broke his concentration.

"Bobby?" the officer said. Now his gun was drawn.

Bobby jumped back, perhaps startled at the use of his real name. Everyone else in the cafe, save Vicki, knew him as "J.C."

"What?" he cried, his voice pitching upward. With the one word, he dropped his pool cue. It fell clattering to the floor. His opponent in the game, seeing the officer's threatening gun, backed up prudently against the wall.

The two men, cop and fugitive, stood but two feet apart. Between them, a literal connecting rod, was Raymer's service revolver, pointed at Bobby's flat stomach. Reflexively, Bobby jerked out his left hand and grabbed the gun, trying to shove it away. At the same moment he snaked his right hand into his trousers and pulled out his own weapon. John Raymer saw the new gun and did not hesitate. He fired. Point-blank. But his weapon was still in the grasp of Bobby's left hand, and the bullet screamed downward, into the floor, ricocheting up to the ceiling where it buried itself. The explosion made the gun barrel so hot, and the powder fumes were so painful, that Bobby let loose of the police weapon for a moment. John

Raymer fired his now freed gun a second time. The bullet tore open Bobby's chest.

He sagged to the floor, his arms reaching out like a supplicant and clutching the cop, pulling him down. The two men fell to the floor, locked in a terrible embrace. At the sound of the first shot, Vicki had run out of the ladies' toilet, and now she saw Bobby writhing on the floor. Then, quickly, he was silent. She rushed to him and flung her body over his, hysterically pushing the police executioner away. She seized Bobby's face and held it in her hands, kissing his eyes, pressing her full weight against him as if she could transfer her life into his. But there was no need. It was over. Vicki raised her head and howled like a mother animal.

"You've killed Bobby!" she screamed, demonstrating to the room that when she forced open his eyes they fell forever shut again.

Stunned, Raymer backed away. He leaned against the pool table. He had never killed a man before. He pointed at the gun that Bobby still held tightly in his lifeless hand. "You see what he's still holding in his hand, don't you?" said the cop in a voice strong enough for a jury to hear. He wanted support from this crowd. When the ambulance came, Vicki could not let go of her lover. Attendants shrugged and lifted both of them onto the stretcher, carrying the dead man and his mourning woman—as one— away.

Raymer was interviewed and his simple story dissected, Bennett came to believe that the death was just what it seemed. It is not inconceivable that a Texas cop would accept a contract to kill a character "in the line of duty."

Raymer is correct that this passage suggests he might have accepted a contract on Vandiver's life. The very next sentences, however, belie such an inference.

But Raymer was not only a respected officer, a grandfather, a devoted churchman, he—most supportive of his story—had enlisted the aid of a brother cop moments before the tragedy. If a lawman wanted to carry out a bounty killing, he would not have chosen an escort, nor would he have done the deed in full view of a cafe crowded with customers.

A plaintiff cannot avoid a summary judgment by taking statements out of context to force a libelous meaning when none otherwise exists. *See Taylor v. Houston Chronicle Publishing Co.*, 473 S.W.2d 550 (Tex.Civ.App.1971).

### Statements Suggesting Raymer Unlawfully Ran People Out of Town

The only passages which the district court indicated might be libelous are those which suggest Raymer used his office to run "undesirables" out of town.

He considered himself on balance to be a decent, God-fearing police sergeant who did what was expected of him, that being observation and eviction of the "characters" who stayed past their tenuous welcome in Longview.

\*    \*    \*    \*    \*    \*

In his nine years on the force Sergeant Raymer ran some of Dallas' meanest men out of his town, and he kept a continuing eye on the comings and goings of Whiskey Bend, a collection of roadhouses and cheap cafes clustered like spores of mold around a curve of the Sabine River just beyond the city line. If an out-of-town hooker or robber-lookin' fellow turned up and stayed but a day or two before moving on, then John Raymer let them be. But should one hang around town long

enough to arouse his suspicion, John Raymer would find reason to suggest a quick leave-taking. When Raymer screwed up his face in a scowl, people usually obeyed. He was not the kind of cop to argue with.

\*    \*    \*    \*    \*    \*

On the midnight of April 18, 1974, he made note of a new car in town, a 1969 yellow Ford with license plates from the Dallas area. Nothing unusual about this, except that it was parked outside the Continental Cafe, nee Charlotte's Grill, an all-night joint that smelled of hamburger grease, spilled beer, and pool-table chalk. Directly beside the I–20, it captured hungry late night travelers and sent them on gulping antacids, and it often housed for a few hours the kind of folk Raymer wanted to escort out of town.

In its order on the motions for summary judgment, the district court stated:

The court does find, however, that those passages [quoted above] which state, as a fact, that Sgt. Raymer "ran" certain individuals out of town at least has the potential for actionable libel. To state that a police officer unilaterally uses his official position to "run" a citizen out of a town where that citizen chooses to be could be construed as an abridgment, without due process, of the Constitutional right to travel under color of law, which could be an indictable offense under both state and Federal law. The false imputation of criminal conduct is grounds for defamation and, in fact, is lielous [sic] *per se* in the local jurisdiction, *e. g. Belo v. Fuller*, 84 Tex. 450, 19 S.W. 616, 617 (1892).

Memorandum Order, p. 7 (footnotes omitted).

The determination of the defamatory nature of these passages was submitted to a jury. The jury returned a verdict finding the passages were not defamatory. Raymer, however, contends the statements are libelous *per se*, that the district court so recognized in its order denying summary judgment on these passages, and that he was therefore entitled to have the jury

charged that the statements were libelous *per se.*

 Under Texas law, a statement which unambiguously and falsely imputes criminal conduct to the plaintiff is actionable *per se, Davila v. Caller Times Publishing Co.*, 311 S.W.2d 945 (Tex.Civ.App.1958), and it is error to submit to the jury the question of whether such statements are defamatory. *Pridemore v. San Angelo Standard*, 146 S.W.2d 1048 (Tex.Civ.App.1941). If, however, a defamatory meaning may exist, but does not necessarily exist, then the statement is considered to be ambiguous and the court must let the jury determine whether the communication was understood by the recipient in the defamatory sense. *Newton v. Dallas Morning News*, 376 S.W.2d ·396 (Tex.Civ.App.1964), quoting from Restatement of Torts, § 614. In such a case, the jury must decide "what effect would the publication have upon the mind of the ordinary reader?" *Houston Belt & Terminal Railway Co. v. Wherry*, 548 S.W.2d 743, 748 · (Tex.Civ.App.1976), *cert. denied*, 434 U.S. 962, 98 S.Ct. 497, 54 L.Ed.2d 447 (1977).

The district judge correctly followed the Texas law. He initially decided that these passages, as a matter of law, are capable of a defamatory meaning. Accordingly, he charged the jury that if, considering Chapter 35 as a whole, the passages at issue suggest Raymer evicted people from town in violation of their due process rights or right to travel, that Chapter 35 must be found to be defamatory. If, however, Chapter 35 is interpreted to suggest Raymer "investigates persons who appear suspicious to him, that his lawful performance of his official duties discourages criminals from remaining in Longview and that he does not abuse his official authority by violating their constitutional or statutory rights," then Chapter 35 must be found to be not defamatory.

 Pursuant to such a charge, the jury decided the passages were not defamatory. Like the trial judge, we consider the passages to be susceptible of either meaning mentioned in his charge and, hence, are ambiguous. Texas law is quite clear that when an ambiguity exists the jury is to resolve it. Accordingly, the judgment is AFFIRMED.