

In The

Court of Appeals

Seventh District of Texas at Amarillo

_____

No. 07-12-00111-CV

_____

MEDICAL GARDENS, LLC; SHADOW HILLS SHOPPING
CENTER, LLC; AND DAVID FLEMING, INDIVIDUALLY, APPELLANTS

V.

LEIGH ANN WIKLE, APPELLEE

On Appeal from the 99th District Court
Lubbock County, Texas
Trial Court No. 2010-554,778, Honorable William C. Sowder, Presiding

May 29, 2013

MEMORANDUM OPINION

Before QUINN, C.J., CAMPBELL, J., and BOYD, S.J.[1]

Medical Gardens, LLC (Medical Gardens), Shadow Hills Shopping Center, LLC (Shadow Hills), and David Fleming (Fleming) appeal from a judgment entered in favor of Leigh Ann Wikle (Wikle). She sued them and others alleging causes of action for breached contract, breach of fiduciary duty, tortious interference with existing business relationship, and defamation. Trial was to a jury which found, among other things, that

---

[1]Senior Justice John T. Boyd, sitting by assignment.

1) Medical Gardens and Shadow Hills breached their contracts with Wikle, 2) Fleming tortiously interfered with Wikle's Shadow Hills agreement, and 3) Fleming defamed Wikle, among other things. The issues before us concern whether there existed sufficient evidence to support the jury's finding that the defamation caused Wikle to suffer damages of $45,000 to her reputation in the past and whether the trial court erred in purportedly failing to require Wikle to segregate her attorney's fees incurred in prosecuting her claims against Medical Gardens from those incurred in pursing her Shadow Hills' causes of action. We affirm.

### Defamation[2]

Fleming manages, leases, and sells commercial realty. He finds property that he believes will make a profit, puts together a group of investors, and then manages and leases the real estate on behalf of those investors. Medical Gardens and Shadow Hills were two such investment groups he formulated and for whom he acts as property manager.

No one disputes that Wikle was an investor/member of both Medical Gardens and Shadow Hills. Nor is it disputed that Fleming caused her expulsion from those investment opportunities. Similarly uncontested is that he defamed her while causing her to be so expelled; that is, he does not contest the jury's finding that his words "create[d] the substantially false and defamatory impression that . . . Wikle was in breach of the Company Agreements." Whether that defamation resulted in Wikle suffering damage to her reputation prior to trial in the sum of $45,000 is being disputed. Because no evidence allegedly supports the award, each appellant prays that it be

---

[2]While some of the statements at issue were written, the parties nonetheless adopted the moniker of defamation when speaking about them. *See Hancock v. Variyam,* 345 S.W.3d 157, 163 (Tex. App.–Amarillo 2011), *rev'd on other grounds,* No. 11-0772, 2013 Tex. LEXIS 394 (Tex. May 15, 2013) (discussing the difference between libel and slander). We follow their lead and use the term.

reversed and that we "RENDER a take-nothing judgment in favor of Appellants relative to Ms. Wikle's defamation claim against Mr. Fleming."[3] Wikle responded by arguing not only that various of the defamatory statements were defamatory *per se* requiring that damage to her reputation be presumed but also that some evidence supports the monetary award. We overrule the issue.

It is true that the mere proof of a defamatory statement does not necessarily entitle one to recovery. Often, the complainant must also show injury. This is not so, though, if the statements are defamatory *per se*. *Hancock v. Variyam*, No. 11-0772, 2013 Tex. LEXIS 394, at *6 (Tex. May 17, 2013). Such utterances "are [deemed] so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and mental anguish."[4] *Id.* Furthermore, the category of statements that are *per se* defamatory include 1) those accusing one of untruthfulness, dishonesty or fraud, *State Medical Ass'n v. Committee for Chiropractic. Education, Inc.,* 236 S.W.2d 632, 634 (Tex. Civ. App.–Galveston 1951, no writ); *Hibdon v. Moyer,* 197 S.W. 1117, 1118 (Tex. Civ. App.–El Paso 1917, no writ), 2) those that impute to the complainant the commission of a crime, indicate he contracted a loathsome disease, or indicate that he engaged in sexual misconduct, and 3) those causing injury to a person's office, business, or profession. *Hancock v. Variyam*, 2013 Tex. LEXIS 392, at *15; *Oliva v. Davila,* 373 S.W.3d 94, 101 (Tex. App.–Dallas 2011, pet. denied); *In re Jennings,* 203 S.W.3d 32, 36 (Tex. App.–San Antonio 2006, orig. proceeding).

---

[3]The legal standing of Medical Gardens and Shadow Hills to urge that position is questionable. Both are entities distinct from Fleming, and neither were ordered to recompense Wikle for Fleming's defamation of her. Indeed, she did not accuse Medical Gardens or Shadow Hills of defamation.

[4]General damages are noneconomic in nature and include compensation for the loss of reputation and for mental anguish. *Hancock v. Variyam*, No. 11-0772, 2013 Tex. Lexis 394, *6 n.4 (Tex. May 17, 2013).

Whether a statement is defamatory *per se* is a question of law. *Hancock v. Variyam,* No. 11-0772, 2013 Tex. LEXIS 394, *13-14. And, while there is a presumption of general damages if the comments are *per se* defamatory, no particular amount beyond nominal is presumed. *Salinas v. Salinas,* 365 S.W.3d 318, 320 (Tex. 2012); *see e.g. MBM Financial Corp. v. Woodlands Operating Co., L.P.,* 292 S.W.3d 660, 665 (Tex. 2009) (stating that $1,000 is not a nominal award). That is, ". . . nominal damages are awarded when 'there is no proof that serious harm has resulted from the defendant's attack upon the plaintiff's character and reputation' or 'when they are the only damages claimed, and the action is brought for the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory matter.'" *Hancock v. Variyam,* No. 11-0772, 2013 Tex. LEXIS 394, at *11-12. So, to award more than a nominal sum, the jury must have evidence before it to support its decision. *Id.* at *13 (stating that "[a]wards of presumed actual damages are subject to appellate review for evidentiary support"); *Bentley v. Bunton,* 94 S.W.3d 561, 605-06 (Tex. 2002) (stating that a jury does not have carte blanche to award whatever amount it chooses but instead is bound by the evidence). With that said, we now address the issue urged by appellants.

Here, the record contains the following evidence. First, Fleming drafted various letters to be used in causing Wikle's expulsion from each investment group. Second, the letters were sent to the membership of each group. Third, in those letters, Fleming expressly invoked a provision of the agreements under which he formed Medical Gardens and Shadow Hills that permitted the removal of an investor/member for "fraud, theft, or gross negligence against the Company." Fourth, the letters also contained allegations of multiple instances of misconduct by Wikle purporting to evince "fraud,

4

theft, or gross negligence." Fifth, only some of those supposed examples of misconduct pertained to the properties or operations of either Medical Gardens or Shadow Hills. Sixth, Wikle testified that Fleming wrote the letters to "make her look bad," "taint" her, and harm her reputation in the real estate community. Seventh, through the letters, Fleming accused Wikle of things such as 1) filing a complaint against him with the Texas Association of Realtors which complaint allegedly "insinuat[ed] that [he] personally was withholding the money due her for a commission on [a] . . . lease," 2) presenting Medical Gardens with a bill for over $4000 for "a general contractor fee" for a project that allegedly did not require a general contractor, 3) refusing to sign the consent form and guaranty required for a loan for a remodeling project at Medical Gardens, 4) violating the terms of a Property Management Agreement on another property by altering the agreement without his consent, 5) refusing to "allow the member buyout provisions" (*i.e.* provisions allowing for the buyout of a member or partner) of another investment property agreement, 6) filing an unfounded felony theft and embezzlement complaint against him, 7) helping another individual file an unfounded complaint against him with the Texas Real Estate Commission, and 8) voting to remove Fleming as the property manager of another property. Eighth, Fleming agreed to indemnify each entity from any attorney's fee "required to enforce this expulsion" and "fund the required expulsion price to the LLC." Ninth, he also informed them that the expulsion could be "done in writing without holding a meeting" and that "it is best to handle the situation in this manner" since he had "been insulating . . . [his] investors from the grief that [h]as been brought **upon me** by a former employee." (Emphasis added). So, a "meeting . . . to air these complaints would not be beneficial to anyone," in his view, and that lead him to attach "a proxy vote sheet" to the letters. Tenth, one could reasonably infer that the

5

lack of a formal meeting would tend to hamper Wikle's ability to personally address the accusations. Eleventh, his success in ousting Wikle from the Medical Gardens group was also cited as a reason for expelling her from Shadow Hills.[5] Twelfth, the investment agreements required unanimity among the remaining members to successfully expel a member. Thirteenth, Fleming had earlier threatened Wikle (via email) with "becom[ing] [her] worst nightmare," vowing that though he "may not win anything . . . you will be out a lot of money for attorney's fees and *your reputation in the local real estate community will be sever[e]ly damaged.*" Fourteenth, due to the manner in which Fleming described Wikle's conduct, one of her business partners testified that she had the impression Wikle was charging more than necessary, believed that Wikle had engaged in wrongful acts, and that a person who took advantage of a situation once would try to do so again. Fifteenth, another co-investor testified that he thought Wikle was trying to gain control of certain properties. Sixteenth, the jury found that Fleming's accusations in the letters "omitt[ed] material facts" or "juxtapos[ed] facts in a misleading way" to create a "substantially false and defamatory impression" of Wikle's conduct *viz* her investor agreements with Medical Gardens and Shadow Hills, which finding Fleming does not contest.

It cannot reasonably be denied that those false utterances were made to divest Wikle of various business interests, implicated and impugned the manner in which she operated her business affairs, were cited as examples of fraud, theft, or wrongdoing against the entities from which she was removed, and induced her co-investors to expel her. Nor can it reasonably be denied that the characteristics of truthfulness, honesty, and fidelity are qualities that are, or at least should be, inherent in those engaged in

---

[5]The Medical Gardens letter was dated July 6, 2010, while the Shadow Hills missive was dated July 21, 2010.

selling real estate or pursuing joint business ventures. *See Hancock v. Variyam*, 2013 Tex. LEXIS 394, at *16-18 (noting that disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession). So, we conclude not only that the falsehoods uttered by Fleming were directed at and affected the conduct of her business as a realtor and real estate investor but also were defamatory *per se* and presumptively injurious.

Injury being presumed, we cannot accept the proposition that no evidence of injury exists. However, this does not mean that our inquiry is over, for we must assess whether the evidence supported the jury's award of $45,000 as damages for "[i]njury to [her] reputation in the past." Fleming argues that it does not because no one testified about her past reputation and only one witness testified that she would not do business with Wikle in the future. Yet, he ignores the evidence that he once employed Wikle and when she left that employ, he nevertheless continued to do business with her. At the very least, that is some evidence of his belief that she was sufficiently reputable to warrant doing business with her. To that, we add evidence of Wikle being a licensed real estate broker who participated in real estate ventures or business partnerships with other investors. That Wikle's reputation was important to her as a real estate broker was quite known to Fleming, given his own email threat regarding her reputation.

So via his defamatory letters, he convinced twelve of the thirteen Medical Garden members and seven of the eight Shadow Hills members to believe she engaged in misconduct warranting her expulsion from their respective business ventures. Additionally, one of those ex-partners testified that she would never again engage in business dealings with Wikle while another concluded that she was attempting to usurp

7

other business opportunities. This is evidence that her reputation was indeed tarnished due to Fleming's words.

It must be remembered that the damages recompensing an injured reputation are non-economic. *Hancock v. Variyam, supra*. As such, they are not easily quantifiable. *Reeder v. Allport,* 218 S.W.3d 817, 819 (Tex. App.–Beaumont 2007, no pet.). Nonetheless, the lost business opportunities when booted from the two partnerships,[6] the belief by nineteen of her prior business associates that she engaged in misconduct and their decision to expel her based on that belief, and the refusal of at least one associate to ever again conduct joint business affairs with Wikle prevent us from concluding that the non-economic damages awarded here lacked some evidentiary support.

### Exemplary Damages

Fleming next argues that the award of exemplary damages should be reversed. He conditions the issue upon our determining that no evidence supported the jury's damage finding awarding Wikle $45,000. Because we found that the award actually had sufficient evidentiary support, we overrule the current contention.

### Attorney's Fees

Finally, Medical Gardens and Shadow Hills contend that the trial court erred in failing to "require Appellee to segregate the portion of the attorney's fees solely attributable to prosecuting the claims against Shadow Hills and the portion of the . . .

---

[6]Wikle invested $30,000 in Shadow Hills (11.54% interest) in 2007 and $10,200 in Medical Gardens (3% interest) in 2008. Fleming gave her a check for $3,675 for her interest in Medical Gardens and $16,875 for her interest in Shadow Hills which checks she returned. Evidence indicated that her interest in 1) Shadow Hills was valued at $47,674 at the time of trial and would gain an additional $30,687 if she held it for nine more years and 2) Medical Gardens was $15,000 at trial and would have grown.

fees solely attributable to prosecuting the claims against Medical Gardens."[7]  We overrule the issue.

As previously mentioned, Wikle sued Medical Gardens and Shadow Hills for breach of contract.  The contracts breached were those under which the two business ventures were formed and operated.  Furthermore, the nature of each breach was the same and involved the expulsion of her from each group in violation of its respective "Company Agreement."  Each expulsion was induced by the defamatory letters Fleming sent to the members of both entities.  Each letter contained much of the same content, including Fleming's promise to indemnify each entity from any attorney's fees "required to enforce this expulsion" and "fund the required expulsion price."[8]  We also note that Fleming used the expulsion of Wikle from Medical Gardens (*i.e.* one breach of contract) to induce her removal from Shadow Hills (*i.e.* another breach of contract).  And, while there was not an exact identity of membership between the two entities, membership did overlap.  More importantly, Fleming, individually or through his company, Fleming Investments, acted as the property manager for each company and personally induced the membership of each entity into giving him their proxy to expel Wikle.  And, again, it is the exercise of that authority given Fleming via the proxies that gave rise to the claims of breached contract.

One perusing the evidence described above could reasonably deduce that Fleming developed one grand design to strike at Wikle and manipulated both Medical Gardens and Shadow Hills into effectuating his plan.  That he agreed to pay the legal fees they incurred in expelling Wikle, as well as the cost of the expulsion, when coupled

---

[7]Again, we note that the same law firm represents both Medical Gardens and Shadow Hills but say nothing of the potential conflict of interest raised by that circumstance.

[8]This leads one to wonder why segregation was necessary if Fleming agreed to pay all the fees irrespective of who incurred them.

with the fact that all three appellants were represented by the same legal counsel at trial is also telling.[9]  If nothing else, it tends to fully exemplify both a unity of purpose and the intertwined nature of the steps necessary to achieve Fleming's goal (which steps included the need for each entity to breach its contract with Wikle).

As held by our Supreme Court, "[i]t is only when legal services advance both recoverable and unrecoverable claims that the services are so intertwined that the associated fees need not be segregated."  *A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007); *accord Spears v. Huber*, No. 07-11-00193-CV, 2012 Tex. App. LEXIS 2168, *8-9 (Tex. App.–Amarillo, March 20, 2012, no pet.) (mem. op.) (stating the same).  While the circumstances in *A.G. Edwards* pertained to attorney's fees incurred in jointly pursuing claims for which fees could and could not be recovered, its essence is nonetheless true here.  Irrespective of whether two different claims against the same party or two different claims against different defendants are involved, the focus should remain on whether the legal services advanced both claims at the same time.  If they do, then they are too intertwined to require the associated fees to be segregated.  And, here, the breach of contract claims asserted against Medical Gardens and Shadow Hills were quite intertwined with each other and with those causes of action alleged against Fleming.  At the very least, Wikle's proving that Medical Gardens incorrectly expelled her also vitiates one ground for removing her from Shadow Hills; this is so because her expulsion from the former was used to justify her expulsion from Shadow Hills.  If her removal from Medical Gardens was improperly done, that event could not reasonably serve to justify her removal from Shadow Hills.  The same can be

---

[9]Again, we say nothing of the potential conflict of interests inherent in such a relationship.

said with regard to disproving the accuracy of the common grounds proffered for her removal in each letter.

It may well be that recovery from each defendant could have been pursued in separate suits, but the evidence would have overlapped. Moreover, pursing the claims in such a manner would have caused the unnecessary use of precious time and enhanced the fees ultimately payable by Fleming.

In sum, the claims asserted against each defendant were inextricably intertwined. Segregation of attorney's fees was unnecessary.

Having overruled each issue, we affirm the judgment of the trial court.


Brian Quinn
Chief Justice