Richard C. LEVINE, Plaintiff-Appellee,

v.

CMP PUBLICATIONS, INC.,
Defendant-Appellant.

No. 83–1362.

United States Court of Appeals,
Fifth Circuit.

Aug. 13, 1984.

---

Haynes & Boone, Donald C. Templin, Daniel E. Westbrook, Dallas, Tex., Townley & Updike, Andrew L. Hughes, New York City, for CMP.

Phalen, Chumlea & McQuality, Joseph G. Chumlea, Mark S. McQuality, Dallas, Tex., David Bragg, Austin, Tex., for plaintiff-appellee.

Before TATE, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

CMP Publications, Inc. appeals the judgment entered against it after a jury trial in this libel action. CMP argues that the two allegedly libelous articles were privileged reports of judicial proceedings and that there was insufficient evidence of either negligence or actual malice to support the judgment of $267,501 in actual damages and $125,000 in punitive damages.[1] We affirm the award of actual damages against CMP, but reverse in part the award of punitive damages because we find no evidence of actual malice on CMP's part in

its publication of the first of the two articles.

## I.

The controversy that generated this litigation began in the early 1970s, when Richard Levine worked for Diecomp, Inc., a New Jersey company he co-founded. Levine was accused by some members of Diecomp's board of directors of incompetence and conflict of interests. In 1972 Levine and Diecomp executed a settlement agreement in which Levine agreed to resign and Diecomp agreed to purchase some of Levine's Diecomp stock. Levine later sued Diecomp and obtained a judgment against it for failure to perform its obligations under the settlement agreement.

The assets of Diecomp were purchased in 1975 by Manufacturing Technologies, Inc. (MTI), a company which was formed for that purpose. Some time after the purchase, Levine and MTI became involved in a dispute over the ownership of some computer software tapes which apparently contained programs developed by Levine for Diecomp. Levine claimed, and still claims, that he found the tapes on the doorstep of his New Jersey home. Levine attempted to have the tapes sold at a foreclosure sale in order to satisfy the judgment which he had previously secured against Diecomp and which Diecomp had not paid in full. MTI was able to obtain an injunction against the foreclosure sale, and Levine signed a consent judgment in which he agreed to return the tapes to MTI.

MTI later discovered that Levine had made copies of some of the Diecomp tapes and had offered to sell the copies to third parties.[2] MTI sued Levine, alleging conversion of the tapes, unfair competition and violation of Levine's employment contract with Diecomp. Levine counterclaimed for breach of the 1972 settlement agreement. This suit, which we will refer to as *MTI v. Levine,* was tried before Judge Harold

---

1. The jury originally returned verdicts against CMP totalling $763,000, and the trial court ordered a remittitur.

2. Levine claimed that he made the copies in case the originals were erased accidentally.

Ackerman, in a New Jersey state court.[3] Judge Ackerman found Levine liable to MTI for conversion of the Diecomp tapes, rejecting, as a finding of fact, Levine's claim that he had come innocently into possession of the tapes. Ackerman also found that the computer program embodied in the software tapes was a trade secret of Diecomp, and later, of MTI, and that Levine had violated restrictive covenants, made in his employment agreement with Diecomp and affirmed in the 1972 settlement agreement, by making copies of the computer tapes and offering them for sale.[4] Judge Ackerman said:

> Plaintiff has established that the defendant was a converter. Certainly, a misappropriator of trade secrets in New Jersey may be enjoined and assessed not only compensatory damages but punitive damages, and he may also be prosecuted ... if the grand jury sees fit in its wisdom to indict him.

Judge Ackerman found that MTI has suffered actual damages of $31,000 by virtue of Levine's conversion of the tapes, which diminished the marketability of MTI's program.[5] He also awarded MTI $20,000 in punitive damages. Levine was awarded $12,213, the amount of his counterclaim under the settlement agreement.

Judge Ackerman stated that he was convinced that Levine still possessed copies of MTI's computer program.[6] He considered issuing a permanent injunction against Levine prohibiting dissemination of any information relating to the Diecomp program, but rejected that course of action, saying,

> I just don't believe that Dr. Levine will obey this Court's order. I don't believe, with all of his intelligence, he will admit that he still has some tapes.
>
> . . . .
>
> I have thought about this very carefully. There is only one way to deal with a man like this: I am referring this matter to the Prosecutor of the Pleas of Union County to determine, for him to determine whether there has been a violation of the criminal statute.

Levine appealed the judgment of *MTI v. Levine* to the New Jersey Supreme Court. He was required under New Jersey law to file a supersedeas bond to secure the rights of MTI pending appeal. Bonds totalling approximately $38,000, the difference between the amount of the award to MTI and the amount of Levine's counterclaim, were posted by friends and relatives of Levine. Levine moved from New Jersey to Texas in August 1979, shortly after he lost his appeal, to take a job with Texas Instruments. MTI, unable to enforce its judgment against Levine personally, began proceedings to levy on the supersedeas bonds in order to collect the amounts owed to it.

Against this backdrop, the actors of this lawsuit began to assemble. In late 1979, Carole Patton, a reporter for a CMP publi-

---

**3.** Judge Ackerman is now a United States District Judge. Levine attempted to block Ackerman's appointment to this position through a campaign of letter writing directed to the Attorney General of the United States.

**4.** After the consent judgment in the first suit by MTI against Levine, in which Levine admitted MTI's ownership of the tapes, Levine wrote letters to several companies in an attempt to sell his copies. One letter said, "We are pleased to report that legal proceedings initiated against us by [MTI] ... were dismissed by the court without a hearing and without prejudice. One copy of computer programs was given to [MTI] and another copy retained by us." Levine later asserted that his attorney had entered into the consent agreement without his knowledge and that he was unaware that he had no legal right to sell the copies.

**5.** MTI's witnesses testified that an important aspect of the program's value to its potential customers was its uniqueness.

**6.** Judge Ackerman said of Levine:

> He is a consummate liar. His knavery knows no bounds. He is petty, he is vindictive. His imagination in thwarting the processes of justice is amazing and frustrating to any court, no less this Court who has been forced to listen to him day after day in what can best be described as a multitude of fairy tales relating to his motives, acquisition, preservation, dissemination, and giving up of a technology program upon which millions have been spent.

cation called *Information Systems News (ISN)*, met by chance John Gutman, president of MTI, at a trade meeting. She told Gutman that she was a reporter for *ISN*, and Gutman offered to tell her about the controversy between MTI and Levine. Patton later conducted a three-hour interview of Gutman during which Gutman gave his version of the facts of Levine's departure from Diecomp and the MTI litigation. Gutman told Patton that in 1971 Levine had been engaged in an illegal kickback scheme with a vendor which constituted a breach of his fiduciary responsibilities to Diecomp. Gutman referred to Levine's later possession of the Diecomp tapes as "a classic case of computer crime." Gutman told Patton that he was working with an assistant district attorney in New Jersey in an investigation of the affair. After this interview, his ire cooled and his feet cold, Gutman refused Patton's request for more specific information regarding MTI's case against Levine.

Patton next obtained access to the court records for *MTI v. Levine*. These records were in the chancery division of the Union County Courthouse. Patton knew that the chancery division handled equity disputes and that it had no criminal division.

In the chancery court file, Patton found a letter indicating that the case had been referred to the economic crime section of the New Jersey attorney general's office. She also found a copy of the 1972 settlement agreement between Levine and Diecomp, the preamble to which included the following statements:

WHEREAS, the development of the PDDC System has not progressed as anticipated; and

WHEREAS, accusations have been made against LEVINE of wrongdoing by taking of secret profits and supplying false and misleading information to stockholders and others, and also accusations have been made against LEVINE of technical incompetence; and

WHEREAS, the parties hereto have now agreed that it is in their respective best interests to resolve their existing differences in accordance with the terms of this Agreement....

In addition, with respect to the alleged kickbacks, the settlement agreement provided:

6. DIECOMP represents and warrants that its Board of Directors has ratified and approved the time sharing service contract between DIECOMP and COMSERV dated March 16, 1970 and LEVINE'S and INFORMATION'S roles therein with full knowledge thereof and has further ratified and approved LEVINE'S performance of his responsibilities and duties as Vice President for Research and Development, it being understood that such ratification and approval is limited to the area of responsible professional judgment and conduct and is not intended as and expressly excludes ratification, approval or release of any wrongdoing, misrepresentation, or fraud. DIECOMP further represents and warrants that its corporate minutes do not contain accusations of wrongdoing or incompetence against LEVINE.

Patton testified at trial that, in her judgment, the "whereas" clause citing accusations against Levine stated "the substance or reason for the separation" and that the warranty by Diecomp was not relevant to the substance of the agreement.

Also in the court file, Patton found an *affidavit made by Gutman*. In that affidavit, in response to allegations made by Levine, Gutman said:

Mr. Levine [alleges] ... that ex-employees have referred to the fact that there were many copies, "floating around," which resulted from the fact that no effective controls were exercised for the protection of whatever material was in fact contained on the tapes. This is erroneous. There were stringent controls made at all times so that no one would have access to the computer tapes which, as I indicated previously, represented an investment of approximately $4,000,000 by various persons. After Mr. Levine made this original accusation in his November 10, 1975 deposition, we made im-

mediate checks to determine the accuracy of his claim, and as of this date, we have been able to find no ex-employee who knows of any other copies that had been made of these tapes that are "floating around." .... It is very difficult to believe that if anyone has possession of the tapes, it came about through lack of security. *If there are any tapes it came about through outright theft.* (Emphasis added.)

In addition to this research, Patton interviewed some of the people who had posted supersedeas bonds on Levine's behalf. She contacted Levine's lawyer, and she contacted Levine in Texas. Levine told her that he had no more money to pay the judgment against him and that a Texas lawyer had told him that his remaining assets could not be reached by MTI. Patton received the impression that Levine was quite willing to have the litigation between himself and MTI publicized.

Based on her interviews and her research in the court files of *MTI v. Levine*, Patton wrote an article about the case which appeared in *ISN* on February 25, 1980, under the headline "Tale of Tapes and Woe Continues to Grow." (This article is reproduced as Appendix "A" to this opinion.) The article described *MTI v. Levine* as a "five-year old software theft case" and reported that Levine "allegedly stole $4 million of software in New Jersey ... in 1974.-" The article focused on Levine's "disappearance" from New Jersey and the fact that MTI was enforcing its judgment against the people who had posted bonds on Levine's behalf. It also repeatedly described· Levine's alleged conduct as theft. Referring to Gutman's affidavit, the article said, "And Gutman accused Levine of 'outright theft.'" The article also stated, "MTI not only charged Levine with theft of the tapes, but with theft of trade secrets as well."

Following the appearance of this article, Levine made a telephone call to Patton, protesting that the article made him appear to be a criminal. He invited Patton to attend a hearing scheduled in a New Jersey court in April 1980 on his motion to reopen the judgment in *MTI v. Levine*. Patton attended this hearing, at which Levine's motion was denied, and she reported on it in the April 21, 1980, edition of *ISN*. (*See* Appendix "B".) The second article, like the first, referred to the litigation as a "five-year-old computer theft case." In the article Patton reported the denial of Levine's motion; then, as background, stated:

MTI's case, originally heard by Judge Harold A. Ackerman, hinged on the charge that Levine had stolen valuable information housed on computer tapes.

Levine was convicted of stealing the tapes in 1977 and lost several earlier appeals in the case, originally launched by MTI in 1974.

Following the appearance of the first article about Levine in *ISN*, his supervisors at Texas Instruments began to investigate the facts behind the New Jersey lawsuit. Levine was immediately suspended without pay and eventually forced to resign his position at Texas Instruments.

In September 1980, Levine filed suit against CMP, Gutman and MTI in federal district court, invoking diversity jurisdiction. MTI was dismissed from the case before trial. After a four-day trial, the jury awarded Levine actual damages of $1,003,500: $490,000 was assessed against CMP as damages stemming from the publication of the first article, $23,500 was assessed against CMP because of the second article. The jury assessed $490,000 of damages against Gutman, whose liability resulted from the republication of the defamatory statements about Levine which Gutman made to Patton. The jury awarded Levine punitive damages of $200,000 and $50,000 for CMP's publication of the first and second articles, respectively. It also awarded punitive damages of $250,000 against Gutman.

The trial court ordered a new trial, or in the alternative, a remittitur. Actual damages awarded against CMP were reduced to $255,001 and $12,500, for the first and second articles, respectively. Actual damages awarded against Gutman were re-

duced to $255,001. Each of the punitive damages awarded was halved.

CMP appeals the judgment ultimately entered against it for $267,501 in actual damages and $125,000 in punitive damages. Gutman settled the case with Levine and has withdrawn his appeal. Levine has withdrawn his cross-appeal attacking the validity of the district court's remittitur order.

## II.

There are several issues before this court. First, CMP challenges the district court's holding that Texas law is applicable to this case. Primarily, however, CMP argues that the articles were privileged as a matter of constitutional and Texas statutory law and that the evidence does not support the jury verdicts to the contrary. CMP contends that the jury's finding that the articles negligently defamed Levine is not supported by the evidence, and it challenges the award of punitive damages on the ground that it was not supported by evidence of malice. Finally, CMP argues that the separate awards of actual damages against CMP and Gutman constitute double recovery.

## III.

 The district court in a written opinion considered and rejected CMP's argument that New York law should be applied to this case. It adhered to this view in its instructions to the jury, which reflect Texas law. Our review begins with the well-known proposition that a federal district court sitting in a diversity case must apply the choice of law principles of the forum state. *Day & Zimmermann, Inc. v.*

*Challoner,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Texas has adopted the most-significant-relationship test for determining which state's law applies to a tort action. *Gutierrez v. Collins,* 583 S.W.2d 312 (Tex.1979). In that case, the Texas Supreme Court announced its adherence to the general rules set forth in the *Restatement (Second) of Conflicts,* §§ 6 and 145. 583 S.W.2d at 318. The district court, noting that Texas defamation law is designed primarily to protect the interest of individuals in preserving their reputations, held that Texas would also adhere to the Restatement rule which states: "When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state." *Restatement (Second) of Conflicts,* § 150(2). The district court relied heavily on the fact that most of the injury suffered by Levine occurred in Texas. However, it also considered the factors mentioned in section 6 of the Restatement [7] in deciding that, on balance, Texas is the state that has the most significant relationship with the tortious conduct and the parties to this litigation. We agree with the district court's analysis of this case under Texas choice-of-law principles, and we do not think it necessary to repeat that analysis here. It is clear to us that, based on Texas' strong expression of interest in protecting its citizens from defamation, Texas courts would not apply New York law to this case.[8]

---

7. These factors include:
 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 (d) the protection of justified expectations,
 (e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
*Restatement (Second) of Conflicts* § 6(2).

8. As the district court noted, New York has adopted a defamation statute which reflects considerably less concern for the rights of defamation plaintiffs than does Texas law. *See Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (N.Y.1975).

## IV.

CMP urges us to reverse the judgment against it because the articles were accounts of judicial or other public proceedings privileged by Texas statute [9] and the federal Constitution. Of course, neither Texas law nor the Constitution protects the publication of accounts of public proceedings if the accounts do not reflect, at least substantially, the truth of those proceedings. Because the jury, on special interrogatories, found both of the articles to be "substantially false and untrue," CMP, in effect, urges that we hold that the articles were privileged as a matter of law. We have examined CMP's privilege claims and find no grounds for reversing the jury verdicts.

## A.

The Texas statutory privilege for "fair, true and impartial" accounts of public proceedings has been interpreted by the Texas Supreme Court in *Denton Publishing Co. v. Boyd*, 460 S.W.2d 881 (Tex.1970), to give protection to all such reports of public proceedings which are at least substantially accurate. Moreover, the privilege is limited to statements which are identifiable by the reader as reports of what was said on the public record, and does not extend to statements which the ordinary reader would interpret as background information or statements of fact. 460 S.W.2d at 883. Where the evidence presents a conflict about whether the published statement is a substantially true account of what was said in the public proceeding or whether the ordinary reader would construe the statement as such an account, then the jury must resolve these issues. 460 S.W.2d at 884–85. Only when "the facts are undisputed and the language used in the publication is not ambiguous, [is] the question of privilege ... one of law ...." 460 S.W.2d at 884. *See also Raymer v. Doubleday & Co., Inc.*, 615 F.2d 241, 246 (5th Cir.1980) ("[T]he jury must decide 'what effect would the publication have upon the mind of the ordinary reader?'").

The evidence presented in this case raised fact questions as to whether the two articles were fair, impartial, and substantially true accounts of the litigation between MTI and Levine. Even a cursory comparison of the articles with the court documents on which Patton relied, and which were submitted to the jury as evidence, reveals inaccuracies in the published reports. For example, in the first article, there are repeated references to allegations of theft against Levine, although in none of the reported proceedings did MTI ever in fact produce any evidence regarding how Levine came into possession of the tapes. Gutman's affidavit testimony does not directly accuse Levine of having stolen the tapes. A jury could reasonably find that the sentence, "And Gutman accused Levine of 'outright theft,'" was not a substantially accurate account of the proceedings in the lawsuit. The substantial truth of the statement in the article that the "New Jersey attorney general's office is considering further legal action, but wonders whether its reach extends to Texas" also is a question for the jury: Patton testified that the person she contacted in the New Jersey attorney general's office seemed uninterested in the case and did not know that Levine was in Texas until Patton revealed that information; furthermore, it is by no means clear that this statement is a report of a public proceeding within the meaning

---

**9.** CMP invokes TEX.REV.CIV.STAT.ANN. art 5432, which provides in part:

The publication of the following matters by any newspaper or periodical shall be deemed privileged and shall not be made the basis of any action for libel.

1. A fair, true and impartial account of the proceedings in a court of justice, unless the court prohibits the publication of same when in the judgment of the court the ends of justice demand that the same should not be published and the court so orders, or any other official proceedings authorized by law in the administration of the law.

. . . .

4. A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information.

of the statute. Finally, the substantial truth of the statement that the individuals who posted appeal bonds for Levine "may be forced to pay for [his] disappearance" is an open issue. It easily could be read by an ordinary reader as suggesting that Levine had violated an appearance bond and was fleeing from the law. Also, a reasonable jury could find that it was not Levine's relocation which caused MTI to levy on the appeal bonds, but rather his failure to pay the civil judgment against him.

Whether these various misstatements and interpretations of fact would create in the mind of the ordinary reader a substantially false impression of the judicial proceedings is a jury question. We cannot say that, as a matter of law, the article unambiguously reported the substantial truth about *MTI v. Levine.* Under these circumstances, the district court did not err in submitting the issue of the substantial truth of the first article to the jury; nor, on the evidence presented to the jury, can we say that the jury's finding that the first article was substantially untrue is unsupported.

As we have noted, after the February 25, 1980, article was published, *ISN* carried a second article on the case in its April 21, 1980, issue. We also decline to reverse the jury's finding that the second article was substantially untrue. Although it reported the denial of Levine's motion to reopen the judgment of *MTI v. Levine,* the second article contained a summary of the information previously reported. Like the first, the second article contained references to Levine's alleged conduct as "theft." Moreover, it contained the statement that "Levine was convicted of stealing the tapes...." Although CMP argues that this statement reasonably reflects Judge Ackerman's evaluation of Levine's conduct,

the statement also fully lends itself to the jury interpretation that Levine had, in fact, been convicted of a criminal offense by a criminal court. Again, under Texas law, the jury must resolve whether articles containing such ambiguous statements are "substantially true." CMP had a fair opportunity to argue for its interpretation, and it did not persuade the jury. On review, we are not persuaded to reverse.

### B.

We must consider also whether the federal Constitution affords some special protection to the articles in question on the independent basis that they are reports of judicial proceedings. CMP argues that it does, relying on cases which we find to be inapposite.

In the first case cited by CMP, *Time, Inc. v. Pape,*[10] the issue was the application of the rule of *New York Times Co. v. Sullivan,*[11] that prohibits a public official from recovering damages for a defamatory falsehood unless the statement was made with actual malice. 401 U.S. at 284, 91 S.Ct. at 636. This rule has since been extended to cases involving "public figures,"[12] but Levine is neither a public official nor a public figure.[13] The Supreme Court held that the failure of *Time Magazine* to use the word "alleged" in its report summarizing a civil rights commission's report of charges against a police chief did not constitute evidence sufficient to support a jury verdict of actual malice. In sum, *Time, Inc. v. Pape* was a very fact-specific case that involved the interpretation of "actual malice" as applied to reports about a public figure. We find nothing in that case which suggests that CMP's articles about Levine are constitutionally privileged.

---

**10.** 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45, *rehearing denied,* 401 U.S. 1015, 91 S.Ct. 1248, 28 L.Ed.2d 552 (1971).

**11.** 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

**12.** *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

**13.** *See* part V.A., *infra.*

*Cox Broadcasting Corp. v. Cohn,*[14] also cited by CMP, concerned the right of a television station to broadcast the name of a rape victim without subjecting itself to liability for invasion of privacy. Its facts differ from those of this case in that the publication was completely accurate: the name of the victim was reported as it appeared on documents available for public inspection. The Supreme Court held that the girl's father could not recover damages for invasion of his privacy as a result of the broadcast of his daughter's name, saying, "the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." 420 U.S. at 495, 95 S.Ct. at 1046. If the articles published by CMP constituted publication of truthful information contained in court records, of course they could not be the basis of a libel action. However, the facts of this case go far beyond those of *Cox Broadcasting,* which, in reality, establishes a rule even less broad than that embodied in the Texas statutory privilege.

■ In sum, we find no suggestion in the precedents cited by CMP that the Constitution protects it from liability for the publication of untrue statements, simply because those statements purport to be fair reports of judicial proceedings, assuming, of course, that liability is not imposed without fault.[15] *Gertz v. Robert Welch, Inc.,* 418 U.S. at 346–47, 94 S.Ct. at 3010. CMP's argument that the articles should be privileged regardless of whether they are substantially true was expressly rejected by the Supreme Court in *Time, Inc. v. Firestone,*[16] when it declined to establish a heightened standard of liability in a case involving a report of a judicial proceeding:

> Presumptively erecting the *New York Times* barrier against all plaintiffs seeking to recover for injuries from defamatory falsehoods published in what are alleged to be reports of judicial proceedings would effect substantial depreciation of the individual's interest in protection from such harm, without any convincing assurance that such a sacrifice is required under the First Amendment.

424 U.S. at 456, 96 S.Ct. at 966.

### V.

Having decided that the articles published by CMP are not entitled to the special protection afforded by Texas law for reports of public proceedings, and that they do not fall within any *special* constitutional privilege, we must decide whether the jury verdict for Levine properly can be upheld under constitutional and state law standards governing defamation actions. This inquiry involves two steps: first, deciding whether the statements in the articles were defamatory, and if so, second, deciding whether CMP can be held liable for publishing them.

### A.

Much of the evidence which supports the jury's finding that the two articles were not privileged also supports its conclusion that the two articles were defamatory. Levine has pointed to a number of statements in the articles which, he argues, cumulatively create in the mind of the ordinary reader the false impression that his conduct was criminal. CMP has argued in

---

**14.** 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

**15.** The dissenting opinion states that "a publication protected by First Amendment freedom of expression is [not] required to be fair and impartial, so long as the expression is truthful." We agree that "impartiality" is not a prerequisite to constitutional protection. Our holding that the articles are not specially protected by the first amendment is based on our finding that the articles are untruthful. The dissent reflects a misapprehension of our use of the terms "fair and impartial" in part IV.A of the opinion. Those terms apply only to the Texas statutory privilege and do not serve as the basis for our holding that the articles are not constitutionally privileged.

We also note our agreement with the dissent's statement that there are no false ideas or opinions under our Constitution. However, this case involves false *statements of fact* regarding Levine's conduct and not opinions or ideas.

**16.** 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

response that each of the statements was supported by the facts. Therefore, the jury was presented with two entirely different interpretations of the evidence before it. We must affirm if the version accepted by the jury is supported by substantial evidence. *Comfort Trane Air Conditioning v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir.1979).

In the first article, there are several statements of fact which, when considered together, support the jury's finding of defamation. (We need not consider whether any one of these statements standing alone supports the finding.) First, Levine argued to the jury that the statement, "Gutman accused Levine of 'outright theft,' " is not supported by the Gutman affidavit, which Patton testified was the source of that information. Instead, Gutman testified before the jury that the affidavit was no such accusation. CMP argued, to the contrary, that the statement is a fair interpretation of the affidavit. Second, the article states that Levine had "disappeared," even though Patton had located Levine without much effort even *before* the first article was published. Levine testified that he had not "disappeared," and offered evidence to support that statement. Third, the comment that the New Jersey authorities were considering further action against Levine was contradicted by Patton's own testimony that the individual she talked to seemed uninterested in the case. In fact, there is no testimony in the record which supports the statement in the first article that the New Jersey attorney general's office was "wondering whether its reach extends to Texas." Of course, all of these remarks must be considered in the context in which they were published: that is, with repeated references to theft and computer crime. Examining the evidence as a whole, we conclude that the jury's finding that the first article defamed Levine is supported by the record. It seems clear to us that a reasonable reader could infer from the article an untrue and damaging impression of Levine: that is, that Levine was an absconding thief and that his conduct toward MTI had been criminal.

Of course, with respect to the second article, the evidence of defamation is even stronger. We need look no further than to the statement that "Levine was convicted of stealing the tapes ...." to uphold the jury verdict. CMP argues to us, as it did to the jury, that the use of the word "convicted" was an appropriate, layman's description of Judge Ackerman's findings in *MTI v. Levine.* The jury found otherwise, and we cannot say that this finding is contrary to the evidence presented, nor is it contrary to the common-sense meaning of the wording used in the second article.

### B.

We turn, then, to the question whether CMP's conduct in publishing the two defamatory articles is actionable. *Gertz* established the constitutional principle that a publisher may not be held strictly liable for the publication of a defamatory falsehood. 418 U.S. at 340, 94 S.Ct. at 3007. If the victim of such a publication is a public figure, then the victim must prove that the publisher acted with actual malice in order to recover. 418 U.S. at 342, 94 S.Ct. at 3008. If the victim is not a public figure, he must prove some fault on the part of the publisher, but the states are free to define the level of fault which will give rise to recovery within this constitutional limit. 418 U.S. at 346–47, 94 S.Ct. at 3010.

CMP argues that its liability may not be predicated upon mere negligence because Levine was a "limited purpose public figure." Alternatively, it contends that the evidence in this case did not establish that it acted negligently.

CMP relies on several facts which, it says, made Levine a public figure. First, it cites Levine's conduct in the controversy over possession of the computer tapes. CMP suggests that the fact that Levine filed the first New Jersey lawsuit, "beginning the volumes of public record regarding the claims described in the articles ..." makes him a public figure. Second, it re-

fers to Levine's campaign against Judge Ackerman's nomination as a federal judge. Finally, it cites the facts that Levine filed a motion to reopen the New Jersey litigation and that he invited Patton to attend the hearing on this motion. CMP argues that by the combination of these actions, "Levine was drawn into this public controversy and became a public figure for this limited purpose."

■■■■■■ CMP's argument is founded in part on the assumption that *MTI v. Levine* was a "public controversy" merely because it was resolved in a public forum, i.e., the state courts of New Jersey.[17] We disagree. *Gertz* speaks of public figures as people who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." 418 U.S. at 345, 94 S.Ct. at 3009. This statement assumes the existence of some public debate over matters that legitimately concern the public. In *Time, Inc. v. Firestone* the Supreme Court held that the fact that an individual resorted to judicial processes did not make her a public figure, nor did the fact that she held "press conferences during the ... proceedings in an attempt to satisfy inquiring reporters...." 424 U.S. at 454 and n. 3, 96 S.Ct. at 965 and n. 3. As in *Firestone*, there is no indication that Levine responded

to Patton's inquiries or invited her to the New Jersey hearing in an attempt to "influence the resolution" of any public controversy.

None of the facts of this case indicates that Levine was a public figure within the meaning of *Gertz*. Levine was, therefore, entitled to recover damages for any defamatory falsehoods contained in the *ISN* articles upon a lesser showing of fault than "actual malice."[18]

## C.

Texas law, in accordance with *Gertz*, defines the level of fault a private defamation plaintiff must prove in order to recover from a publisher as negligence, meaning that the publisher knew or should have known that the article was false and that the content of the article would warn a reasonably prudent editor of its defamatory potential. *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809 (Tex.1976), *cert. denied*, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977).

■■■■■■ In our review of the evidence presented, we find substantial support for the jury's finding that CMP was negligent in publishing each of the two articles about Levine.[19] Patton's own testimony estab-

17. We reject altogether CMP's suggestion that Levine's opposition to Judge Ackerman's nomination made him a public figure for the purpose of these articles, which did not even mention the position Levine had taken in that controversy.

18. CMP does not argue that the district court erred in submitting the question whether Levine was a public figure to the jury. *See, e.g., Brewer v. Memphis Publishing Co.*, 626 F.2d 1238 (5th Cir.), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1980). We need not address this question because we find no error in the jury's conclusion that Levine was not a public figure.

19. Our fundamental difference of opinion from the views expressed in the dissent arises because we are convinced that the more rigorous standard of review mandated by *Bose Corp. v. Consumers Union of United States, Inc.*, —— U.S. ——, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), for awards of actual damages in defamation suits brought by public-figure plaintiffs, is inappro-

priate here. Ten years ago in *Gertz* the Supreme Court recognized that there are important, salutary and constitutionally founded reasons for maintaining distinctions between defamation actions brought by private individuals and those brought by public figures and for allowing the states to regulate the former within much less restrictive bounds than those imposed by the federal courts in the latter. Until the Supreme Court overrules it, this court must abide by *Gertz* by applying principles of state, not federal, law to defamation suits brought by private persons.

Under Texas law, the truthfulness of an allegedly defamatory publication is a jury question unless the language used therein is unambiguous. Truthfulness is certainly a jury question when, as in this case, conflicting evidence about the facts of the event reported creates a need for the finder of fact to make credibility choices based on the demeanor of witnesses. Even the *Bose* court recognized that it is important for the reviewing court to respect such choices made by the finder of fact. 104 S.Ct. at

lished that she knew *MTI v. Levine* was a civil case and that no criminal conviction had been rendered against Levine. Patton stated that she had covered criminal trials before and was aware of the difference between criminal and civil trials. Despite this knowledge, Patton wrote two articles about Levine both of which could reasonably be interpreted by an ordinary reader to impute criminal conduct to Levine. Reviewing the record, we find substantial evidence from which a reasonable jury could find that CMP negligently defamed Levine by publishing the articles.

In the first article, Patton wrote that Levine had "disappeared," even though she herself had contacted Levine before the article was published and even though she had done so with little difficulty. (Levine was listed at his new job in a professional index.) The jury easily could have found that this statement, when coupled with the other references in the article to theft and crime, was negligently written and published because it gave the false impression that Levine had moved to Texas in order to "flee the law." The jury finding of negligence is clearly supported given the knowledge Patton possessed at the time she wrote the article. Similarly, a reasonable jury could find Patton's false statements about the New Jersey criminal investigation to have been the result of her negligence. Patton testified that Gutman told her he was cooperating with New Jersey authorities in an ongoing investigation of Levine. However, any false impression Patton received from Gutman was corrected when she telephoned the New Jersey attorney general's office and found little evidence of any interest in the case. With respect to the most damaging comment in the first article, the "accusation" made by Gutman, Patton testified that what she wrote was, in her view, an accurate interpretation of the Gutman affidavit. Gutman, at trial, denied that the words of his affidavit were meant to be construed in such fashion. We believe that the jury

verdict is further supported by this evidence of CMP's negligence in publishing its version of the affidavit. On its face, the Gutman affidavit did not accuse any particular person of theft. Moreover, Patton had read the entire trial record of *MTI v. Levine*, and she knew that MTI had been unable to produce any evidence that showed that Levine had stolen the tapes. Patton also knew that Levine denied having come into possession of the tapes in a wrongful manner. Knowing all this, Patton could be said to have been negligent in publishing the statement, "And Gutman accused Levine of 'outright theft.'"

In summary, the jury's finding of negligence on the part of CMP in publishing the first article is amply supported by the evidence. One factor which may have strongly influenced the jury was Patton's testimony that at the time she first met Gutman she was "interested in" computer crime and felt that a story on computer crime would be of interest to her readers. The article as a whole gives an impression of Levine that is false and that Patton should have known was false based on the evidence before her.

With respect to the second article, Patton's negligence is clear. In it she stated that Levine was convicted of theft. Patton testified that she used the word "convicted" based on her conclusion that Judge Ackerman believed Levine guilty of a crime. In fact, however, Judge Ackerman specifically stated that he had no authority to adjudge Levine guilty of a crime, and he referred the matter to the state prosecutors for investigation of whether a crime had been committed. Patton knew these facts. In addition, at trial Levine testified that he telephoned Patton after the first article was published and before the second went to press. Levine said he told Patton that the first article made him appear to be a criminal, and she seemed to understand his objection. Based on this evidence, the jury was certainly entitled to believe that

1959, 1965. The argument presented in the dissent that the first article is substantially truthful reflects a different view of the evidence presented in this case from the conclusion reached by the jury. However, *Gertz* prevents this court from substituting our judgment for the jury's.

Patton fully understood the falsity of the words she published in the second article.

In addition to evidence of Patton's negligence, evidence at trial showed that CMP was also negligent in publishing the articles about Levine. The testimony showed that Patton's editor at *ISN* worked closely with her in the preparation of the articles. There was sufficient evidence for the jury to believe that he was well aware of the information on which they were based. Furthermore, there was evidence that he suggested changes in the articles, though not changes which would have tended to make them less defamatory.

Levine's expert witness testified that the language used in each of the two articles would alert a reasonably prudent editor: "I would automatically wonder if this is a civil case or a criminal case ... [because of] the use of those terms such as theft or stolen .... I would want the reporter to clarify that information...." CMP's own expert witness admitted that the language used in the two articles was potentially libelous.

Having reviewed all the evidence, we decline to overrule the jury's finding that CMP was negligent in publishing the articles. CMP was provided with many indications, both in the text of the articles and through Patton's investigations of the *MTI v. Levine* record, that the articles may not have fairly and truthfully reflected that litigation. In publishing the articles in the form it did, CMP knew or should have known that it was subjecting itself to potential liability, and we affirm the award of actual damages rendered against it.[20]

## VI.

 Despite the strength of the evidence that CMP acted negligently, we are not convinced that the award of punitive damages. with respect to the first article was supported by *clear and convincing proof* that CMP acted with "actual malice." This proof is, under *Gertz*, a constitutional prerequisite to the award of punitive damages to a private defamation plaintiff. *See Golden Bear Distribution Systems v. Chase Revel, Inc.*, 708 F.2d 944, 947 (5th Cir.1983). In reviewing the jury's finding that CMP acted with "actual malice," we are not bound by our usual standards of extreme deference, but are required to judge by ourselves whether the record supports the finding with clear and convincing proof. *Bose Corp. v. Consumers Union of United States, Inc.*, — U.S. ——, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

 Actual malice, in this context, means knowledge that the defamatory statement was false or reckless disregard of whether it was false, a definition derived from *New York Times, Inc. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 726. The only evidence presented in this case which would support a finding that CMP had such knowledge or reckless disregard for the truth as to constitute actual malice is the testimony of Patton, to the effect that she knew the difference between civil and criminal proceedings, summarized, in part, above. In the first article, though, Patton did not characterize the judgment as a "conviction." Patton's testimony reflects the fact that her very negative impression of Levine's conduct was created by Judge Ackerman's remarks. Having read these remarks, the tone of which is captured only partially in the brief quotations reproduced herein, we are sympathetic to CMP's claim that a lay person could read them as suggesting that Levine's conduct was of a

---

**20.** CMP argues that the awards of actual damages against it and Gutman were duplicative, that is, that the jury failed to apportion Levine's actual damages between the two defendants but rather assessed the entire amount against each of them. We agree with the district court that it is equally plausible that the jury decided on the amount of damages suffered by Levine and assessed one-half of that amount against each defendant. In any event, the district court's

finding that there was no evidence to support CMP's construction of the jury award was not clearly erroneous, and we must uphold it under Fed.R.Civ.P. 52(a).

Similarly, we decline to overturn the amount of the actual damages award. The district court's order of May 4, 1983, granting CMP's motion for new trial unless Levine accepted remittitur, reflects an award of actual damages which is not, in our opinion, excessive.

criminal character. (We note that publishing such an impression, however, may, as the jury found, be a basis for negligence as opposed to malice.)

■ In *Dacey v. Florida Bar, Inc.,* 427 F.2d 1292 (5th Cir.1970), this court held that summary judgment should have been granted against a plaintiff, a public figure, who had reportedly been convicted of the unauthorized practice of law. In fact, the plaintiff had been enjoined from engaging in the unauthorized practice of law. Notwithstanding the fact that the reporter in *Dacey* was a lawyer, we held that the plaintiff had not shown actual malice: "There is no evidence the [the reporter] had any knowledge or suspicion of the falsity of the statement made by him, nor is there any proof that he had before him any indication that his conclusions were incorrect." 427 F.2d at 1295. As in that case, there is no clear and convincing evidence that Patton or her editor doubted the accuracy of her reporting at the time that the first article was published. *Dacey* compels us to reverse the punitive damage award with respect to the first article.[21] There was no clear and convincing evidence presented which would support a finding that CMP's conduct with respect to that article constituted "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." 427 F.2d at 1296, *quoting Butts,* 388 U.S. at 155, 87 S.Ct. at 1991.

■ However, our independent review of the record convinces us that the judgment of $25,000 in punitive damages against CMP with respect to the second article is satisfactorily supported by the evidence. Unlike the first, the second article actually states that Levine was "convicted of stealing." The evidence which distinguishes the second article from the

first and from the publication in *Dacey* is Levine's testimony that, by the time the second article was written, Patton had been put on notice that her characterization of *MTI v. Levine* as a criminal case was false. As we have noted, Patton was aware of the differences between criminal and civil cases, including the fact that a civil court cannot render a criminal conviction. Levine testified that, after publication of the first article, he called Patton and protested that the article "made [him] appear to be a fugitive from justice, a criminal, or some type of sneak thief." Asked whether he explained to Patton that *MTI v. Levine* was not a criminal case, Levine replied, "Yes, and she seemed to understand. . . ." Not only did Patton fail to correct her mischaracterizations of *MTI v. Levine* in the second article, she strengthened them by stating that Levine had been "convicted of stealing." This fact further supports our finding that the evidence of actual malice was sufficient to support the jury verdict relating to the second article.

In the light of this evidence, we decline to reverse the award of punitive damages returned for the second article. The allegation that an individual has been convicted of a crime is a very serious one—one which no responsible publication would make lightly. Evidence that CMP printed such a statement after having been told that it was untrue warrants submission to the jury of the question whether CMP acted with reckless disregard for the falsity of the content of the second article.[22]

### VII.

In summary, we affirm the judgment of the district court in all respects except for the award of punitive damages of $100,000 with respect to the first article. The dis-

---

**21.** The jury awarded Levine $200,000 and $50,-000 in punitive damages for the first and second articles respectively. The trial judge reduced these awards to $100,000 and $25,000 on remittitur.

**22.** CMP's argument that Texas law requires a jury instruction on common-law malice, defined as "ill will," as well as actual malice, as defined

by *New York Times, Inc. v. Sullivan,* is not well founded. The jury instruction on actual malice comports with Texas law. *See A.H. Belo Corp. v. Rayzor,* 644 S.W.2d 71, 84–85 (Tex.Civ.App. 1982), *writ ref'd n.r.e.* (reciting the *New York Times, Inc. v. Sullivan* test for actual malice in a defamation suit brought by a public figure).

trict court is instructed to enter judgment in accordance with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR ENTRY OF JUDGMENT.

## APPENDIX "A"

*Information Systems News—Monday, February 25, 1980*

### Tale Of Tapes And Woe Continues To Grow

Richard C. Levine is alive and well and working at Texas Instruments Inc., Dallas, Texas.

Normally there'd be nothing wrong with that rather sedate state of affairs. But Dr. Levine's new location is causing lots of new complications in an already bizarre, five-year-old software-theft case.

Levine, you see, allegedly stole $4 million of software in New Jersey back in 1974. Despite a novel explanation of how he came into posession [sic] of the three reels of computer tapes—he says he found them on the porch of his South Plainfield, N.J. home—he lost two civil lawsuits and one appeal.

As a result of the triple court loss, he was ordered to return the tapes, the numerous copies he had made and to pay the owners $51,000 in damages.

Before paying the prescribed penalty, however, Levine moved to Texas. The New Jersey attorney general's office is considering further legal action, but wonders whether its reach extends to Texas. And Levine's friends, who posted a $38,000 personal property bond to help him make his ill-fated appeal, may be forced to pay for Levine's disappearance.

The tale of Levine and the tapes began when Manufacturing Technologies Inc., a Hartford, Conn.-based company, sued Levine twice: once in 1975 for return of the three tapes and again in 1976 for return of 15 copies of the tapes Levine had made.

MTI president John S. Gutman said the tapes contain the results of five years of research—$4.2 million and 100 man-years of programming.

Throughout the hearings, Levine—who had been trying to sell the tapes—maintained they had been "left" on his front porch around Christmastime.

The tapes, said Gutman, contain work toward a new kind of computer-aided-design, computer-aided-manufacturing (CAD/CAM) concept—a computerized method for progressive design of dies.

In 1969, Levine conceived of computerizing the entire process, the molds, the stamping dies, the forming dies, through whatever number of stations were involved, to the finished product.

Levine, according to Gutman, had rationalized the process of design, and a company Levine and two others formed, Diecomp Inc., began creating the systems architecture, the data base and coding to carry out the process.

But Levine left Diecomp in 1972 at the request of the board of directors. In a settlement agreement, Diecomp's board charged him with "technical incompetence" and with "taking secret profits and supplying false and misleading information to stockholders." Board chairman Gutman claimed he had been taking "kickbacks from vendors. We gave him an hour to get out."

In August 1975, Diecomp closed its doors. Gutman and several other investors formed Manufacturing Technologies Inc., put Diecomp's assets up for public auction, and then bought the company for $310,000.

Meanwhile, Diecomp defaulted on part of the monies owed to Levine in the settlement following his forced resignation. Diecomp stopped sending money to Levine in December 1974—the same month that Levine received his mysterious "Christmas present."

Levine filed for a judgment against Diecomp to collect his unpaid $10,000 in July 1975. He turned the tapes over to the sheriff of Union County, Ralph Oriscello, to be sold at auction.

But Manufacturing Technologies disputed his claim to the tapes, all dated 1974–75—three years after Levine had left the company. MTI sued both Levine and the sheriff on the grounds that the tapes were the principal asset MTI purchased when buying Diecomp.

And Gutman accused Levine of "outright theft."

In December 1975, Levine agreed to turn the three tapes held by the sheriff over to Manufacturing Technologies. But Levine said during testimony that one of the tapes was not, in fact, from among the three tapes mysteriously left on his porch. It was a copy.

When the court questioned Levine about why he had made copies of the tapes, he said, "I didn't think the sheriff had certified magnetic tape storage facilities."

While Superior Court Judge Harvey Osborne did rule that the three tapes held by the sheriff should be returned to Gutman's firm, Osborne would not rule on the copies. "Our ability to finance or attract new capital is at a standstill if we can't prove that the tapes are controlled exclusively by us," Gutman complained at the time.

So, Manufacturing Technologies went to court again for return of all the copies made by Levine. This time the case was much more complex. MTI not only charged Levine with theft of the tapes, but with theft of trade secrets as well. The firm wanted a permanent injunction against Levine, restraining him from entering the marketplace.

Levine countered by stating that all the people involved in Diecomp's transition to Manufacturing Technologies were really the same people who had conspired to defraud Levine and other creditors.

He also testified that Diecomp had ceased developing the progressive die concept and was manually producing die designs into computer-drawn designs—and selling them as a CAD/CAM product.

The tapes, he claimed, were "dumps"—data of formulas from trade manuals on designing dies and computer programs for math problems and plotting machines.

In 1977, MTI was awarded the tapes, including the 15 copies, plus $51,000 in damages.

Levine's attorney, Morris M. Schnitzer, appealed the judgment of Superior Court Judge Ackerman, and nine associates of Levine posted bonds totaling more than $38,000. But on April 19, 1979, a three-judge panel sustained Ackerman's ruling.

Three months ago, Levine moved to Texas. Contacted there by *ISN*, he said he had no comment at this time.

Last month MTI began extracting judgments against the nine who had posted Levine's bonds.

Many of the bonds, like that posted by Carl Astrin, were for $1,000. But some were for more substantial amounts. Nathan B. Marple of Emerson, N.J. put up $10,000; Lou Seidman of Plainfield put up $9,660, and Mary S. Levine, also of Plainfield, put up $11,340.

"It amazes me," Union County's Court Clerk said, "that Dr. Levine could have talked all those people into putting up that amount of money."

Astrin, with two girls in college and a young son in private school, said he will pay off the bond in $50-a-month installments—if the court allows.

"Levine is a good friend," Astrin said. "I know he'll pay us all back—whenever he sells his house."

—Carole Patton

APPENDIX "B"

*Information Systems News—Monday, April 21, 1980*

**Judge Denies New Levine Plea**

A motion to reopen a five-year-old computer theft case against Richard C. Levine, a computer expert and inventor now working at Texas Instruments Inc., has been denied by a New Jersey Superior Court judge.

In a hearing which lasted less than 10 minutes, Judge Frederick C. Kentz Jr. ruled that eight affidavits submitted by Levine failed to demonstrate "willful fraud" on the part of the plaintiff, Manufacturing Technologies Inc. of Hartford, Conn., and did not constitute "new" evidence.

Levine, who represented himself, based his plea on sworn statements alleging that MTI had misrepresented its product to the court as a highly valuable proprietary trade secret.

MTI's case, originally heard by Judge Harold A. Ackerman, hinged on the charge that Levine had stolen valuable information housed on computer tapes.

Levine was convicted of stealing the tapes in 1977 and lost several earlier appeals in the case, originally launched by MTI in 1974.

Among the affidavits submitted to the court by Levine April 3 was a statement by Michael Lohman, a computer-aided design specialist, which claimed MTI's software was similar to four other CAD/CAM products on the market for ten years.

Levine also submitted a sworn statement from the MTI's former top engineer, Alfonso Varon. Varon said MTI's system was never workable and all designs had to be reworked by human engineers "to prevent nonsense results."

In a related development, MTI's attorneys charged the company has been unable to collect the $52,000 Levine was ordered to pay. The attorneys also claimed MTI has been unable to collect any of the $38,000 in personal bonds nine of Levine's associates posted for him during an appeal in 1977.

MTI counsel Barry Eisenberg called Levine's latest petition "just another stalling action" designed to delay the company's attempts to collect its judgment.

After the hearing, Levine said he would continue his attempts to reopen the case and called Kentz's decision "a great injustice."

TATE, Circuit Judge, dissenting:

With much respect to the views of my conscientious brethren, I must nevertheless dissent from the majority's affirmance of the award against the publisher for the *first* article of February 25, 1980, *see* Appendix "A", *supra*, 738 F.2d at 676. In my view, the first article is an essentially accurate lay summary of civil proceedings, identified as such, in which Levine was found by the state trial judge to have converted computer tapes and to have misappropriated trade secrets of his former corporation.

The majority affirms the jury finding that the reporting of the civil proceedings was negligently done *and* contained defamatory falsehoods. In its valiant and commendable effort to uphold the jury verdict, however, the majority has inadvertently critiqued the first article for jury-findable falsehoods and negligence with the eye of a law review note editor. I believe the standard of judicial review of utterance within the potential ambit of the First Amendment does not permit such justifying approach in order not to disturb a jury verdict against a publisher.

The majority has correctly found Levine to be a private individual rather than a public figure. That being so, the measure of whether the libel award for publication of this article offends the First Amendment is provided by *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). By this measure, a private defamation plaintiff may recover (only) such damages as are sufficient to compensate for actual injury, insofar (as here) recovery is allowable under state law, which may constitutionally provide for recovery for defamatory falsehoods negligently published. This measure is to be compared with the standard prohibiting libel recovery by public officials and public figures, which may not be constitutionally upheld absent "actual malice" in their publication. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *See generally* Nowak, Rotunda, and Young, Constitution-

al Law, 780–89 (1978) and Tribe, American Constitutional Law, 633–48 (1978).

*Gertz* does not, however, address the issue as to the standard of appellate review or as to the extent of required appellate deference to jury findings (a) that an article contained defamatory falsehoods and (b) that these jury-found-inaccuracies were negligently accomplished. For reasons to be developed more fully, in my view, the majority is in error in rubber-stamping the jury verdict as to the first article because: (1) an examination of the article against the judicial proceedings and conduct upon which it is founded would not, under the normal standard of review, permit a reasonable-minded jury in a First Amendment case to conclude that the first article offended in either of these two factual respects; and (2) the recent United States Supreme Court decision in *Bose Corporation v. Consumers Union of United States, Inc.,* —— U.S. ——, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)—although limited in specific holding to appellate review of jury-found "actual malice" in a *New York Times v. Sullivan* context—bespeaks to me a broader holding that requires independent appellate review in defamation cases before stripping a public report of public proceedings of First Amendment protection. .

### (1)

The majority has fairly stated the facts. This Texas-based litigation arises out of a publication of an article (February 25, Appendix "A") relating to litigation by and against Levine in New Jersey, where he was formerly employed. Levine was employed in Texas at the time of the publication. The New Jersey litigation concerned his alleged conversion of some computer tapes from a corporation. The article described that litigation and characterized Levine's underlying conduct primarily as reflected by that litigation, including a reference to a statement in an affidavit therein by Gutman,[1] an official of an opposing par-

ty, that as to the tapes in Levine's possession, this could only have come about through "outright theft." The article also included facts obtained from interviews relating to events surrounding the litigation.

As the majority's statement of the facts underlying the published article shows, 738 F.2d at 663–666, the article primarily concerns post-1972 litigation in which the state trial court found that Levine had converted computer tapes from the corporation and had misappropriated its trade secrets. Prior to the litigation in New Jersey, Levine had left the corporation in 1972 on accusations of incompetence and of a conflict of interests; a settlement agreement between the corporation and Levine took note of the circumstance that "accusations have been made against Levine of wrongdoing by the taking of secret profits", of supplying false information and of "technical incompetence". However, in the settlement agreement, the corporation ratified a time service contract entered into between Levine and a third party and "ratified and approved Levine's performance of his responsibilities and duties ...", it being understood that such ratification is limited to the area of responsible professional judgment and conduct and is not intended to and expressly excludes ratification, approval, or release of any wrongdoing, misrepresentation, or fraud."

In my view, the article of February 25, 1980 (see Appendix "A", majority opinion) is a substantially accurate representation of the New Jersey proceedings and of the 1972 settlement. It may not have been totally "fair and impartial" in a lay sense, as the majority notes, because of its arrangement and emphasis on indicia of wrongdoing. However, it represents a point of view of the facts that is not unreasonable, and it does not contain any substantial falsehoods. I do not believe that a publication protected by First Amendment freedom of expression is required to be fair

---

**1.** Gutman, a codefendant in this suit, was assessed, upon remittitur of the jury award, $255,000 in compensatory damages and punitive damages of $125,000 (for these statements and other defamatory statements made by him to the reporter). Gutman's case was settled after his appeal, so no issue regarding these findings is before us.

and impartial, so long as the expression is truthful.

Statements in the jurisprudence that the published description must be "fair and true" are equated only with a requirement that the published description be substantially truthful. The jurisprudence uses the term "fair", in the context of the phrase "fair and accurate", in the sense of a "fair" representation of the observed event or utterance, rather than "fair" in the sense of a balanced or unbiased account of an event uncolored by the author's own opinion. (I am cited to no authority that holds otherwise.) Thus, an editorial may contain a "fair" (*i.e.*, accurate) representation of the facts discussed, while asserting a biased and partial perspective as to those facts, without departing from the protection of the First Amendment.

This defamation action claims harm essentially because of the published report of the particulars of litigation and of public records. Congruently with the governing principles that here apply in favor of the publication's defense against it, the Supreme Court has held, in denying an invasion of privacy action by a private individual aggrieved by public broadcast of particulars of litigation proceedings: "At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records." *Cox Broadcasting Corporation v. Cohn*, 420 U.S. 469, 496, 95 S.Ct. 1029, 1047, 43 L.Ed.2d 328 (1975). "Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government...." *Id.*, 420 U.S. at 495, 95 S.Ct. at 1046. I do not read that decision as permitting that freedom of the press—to print what is in public records of litigation—to be subverted because some particular trier of fact or some particular appellate tribunal deems that the publication's substantially accurate report

was nevertheless not "fair" or "impartial", so long as it is substantially accurate.

What is "fair" or "impartial" depends upon the subjective evaluation of the evaluator. While I may think a dissent to my opinion or a motion for rehearing as to it is not fair and impartial, doubtless the dissenter or the rehearing-movant is equally sincere in the belief, if any, that my opinion is not fair or impartial. By reason of our constitutional guarantees, the fundamental values in freedom of publication and free expression of point of view (see (2) *infra*) simply cannot be inhibited by exposure to liability for that expression when it is subjectively deemed by a particular jury or a particular appellate panel to be unfair and partial. Similarly, an article that is substantively accurate—judged in the light of the objective facts sought to be depicted—cannot be deprived of First Amendment protection by a factual finding that it is substantively *in*accurate simply because some trier of fact may find the selection and emphasis upon the objective facts to be offensively unfair and biased.

*Gertz, supra,* exempted from First Amendment protection only "defamatory *falsehoods*", 418 U.S. at 332, 94 S.Ct. at 3003, of private persons, if negligently made. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges or juries but on the competition of other ideas." *Id.*, 418 U.S. at 339–40, 94 S.Ct. at 3007. It is thus immaterial for libel-liability purposes that the overall impression of the article conveyed the writer's opinion, here shared by the state trial judge who so expressed himself in the state proceedings, that Levine had converted and misappropriated the property of another and had otherwise engaged in shady conduct. The objective standard constitutionally imposed is that, for libel liability to lie in this instance, the expression must be not only substantially false, but also that such falsity resulted from intent or negligence.

The majority finds that the evidence raised fact questions as to the substantial truth of the published reports. As I see it, quoting from their opinion, the majority finds that jury-triable issues as to the article's substantive accuracy are presented in the following respects: (1) "repeated references to *allegations* of theft against Levine, although in none of the reported proceedings did [the corporation] ever in fact produce any evidence regarding how Levine came into possession of the tapes"; [2] (2) Gutman's affidavit does not "directly accuse Levine of theft," and "[a] jury could reasonably find that the sentence, 'And Gutman accused Levine of "outright theft"', was not a substantially accurate account of proceedings in the lawsuit"; [3] (3) "The substantial truth of the statement in the article that 'the New Jersey attorney general's office is considering further legal action, but wonders whether its reach extends to Texas' also is a question for the jury"; [4] and (4) the "substantial truth of the statement that the individuals who posted appeal bonds for Levine 'may be forced to pay for [his] disappearance' is an open issue. It *easily could* be read by an ordinary reader as *suggesting* that Levine had violated an appearance bond and was fleeing from the law" [5], Majority, 738 F.2d at 668–669 (emphasis added by the writer). For the reasons stated in notes 2 through 5, *supra*, I would find that none of these circumstances are actionably inaccurate.

Nor, for the reasons so stated, does the overall impression of the article, in my opinion, constitute a substantially untrue statement by omitting "facts ... which partially refute the false impression of the partial statement" or "by omission of part of the facts." *Golden Bear Distributing Systems v. Chase Revel, Inc.*, 708 F.2d 944, 1949 (5th Cir.1983). In the cited decision, a libel award was upheld when untruthful facts were mixed with truthful facts in a way that imported wrongdoing to the libel plaintiff that was in fact committed by another entity, with the overall impression being that the libel plaintiff had itself committed these wrongful acts. Here, however, wrongful acts were in fact committed by the present libel plaintiff, as expressly held by the state trial judge in the proceedings described in the allegedly defamatory article. Evaluated in terms of a lay reader, not of a legal technician, no inaccuracies (and certainly no *negligent* inaccuracies) were stated in the published summary de-

---

**2.** The state trial court, in fact, found that Levine had "converted" the tapes—which, under the circumstances, meant that he had removed them from their lawful owners and had attempted wrongfully to keep possession of them. In lay parlance, "*allegations* of theft" were in fact made by the company—and Gutman's affidavit in the state court record was, in fact, to the effect that the tapes in Levine's possession "came about through outright theft"—from which a reporter could, without negligence, reasonably infer that the affidavit accused Levine of theft. The article specifically identifies these allegations as arising in "two *civil* lawsuits". I do not think it to be either negligent or inaccurate to refer to Levine's misappropriation of the tapes as an alleged "theft" instead of as a "conversion" of them—the latter term may be more technically accurate for legal proceedings, but it would be completely unintelligible to a non-lawyer reader. Moreover, had the reporter used "conversion" with a full law-dictionary explanation of the term, Levine's reputation would have been as much damaged as by the lay shorthand term actually used to express the concept.

**3.** As previously noted in note 2, *supra*, Gutman's statement in fact was to the effect that Levine "stole the tapes", and it is in fact the most reasonable interpretation of what he intended to say.

**4.** The majority's conclusion that the accuracy of the statement presents a jury question, in my opinion, fails to demonstrate the falsity of the statement or the negligence of the article in so stating. The New Jersey Attorney General did in fact open an investigation of Levine's actions in this incident (R.V., pp. 245–49, 265–66), and the state trial judge did in fact refer Levine's conduct to the county prosecutor.

**5.** The majority's finding a factual issue of accuracy on the basis of what some readers "could" infer overlooks that in substance the article is true. The persons who signed the appeal bonds *might* indeed be forced to pay them, and that the technical reason for their doing so was that Levine did not pay the judgment, instead of that he disappeared from the scene without paying it, does not on its face appear to be defamatory.

scription of the long and somewhat technical litigation.

My concern, however, as was that of my conscientious brothers of the majority, centers upon the extent that these appellate views can override the factual conclusion to the contrary of a properly instructed jury. As I suggest in (2) *infra*, the Supreme Court's recent decision in *Bose Corporation, supra*, has recently indicated that independent appellate review is required of libel awards, where First Amendment protection of expression is at issue, whether in favor of private persons or of public figures.

Nevertheless, if I am in error in this regard, the Supreme Court's expression therein imports, because of the fundamental constitutional values at issue, a broader appellate review of what a reasonable-minded trial jury could conclude as to whether a published statement is actionably false and was negligently made. That is, the permissible range of jury inference of negligence in a non-constitutional area (such as a personal injury suit) may be far greater than as to utterance within the ambit of the First Amendment protection, because of the constitutional values at is-

sue in the latter. First Amendment-exempting negligence, thus, is as a matter of constitutional law more subject to judicial control as to its outer limits and less left to the unfettered discretion of the jury to infer negligence from factual behavior than in other non-constitutional areas of the law.

This differing appreciation of the judicial scope of review of jury verdicts in First Amendment cases is the crux of the differences between my esteemed brethren of the majority and myself. I note, however, that although judicial review of jury findings in First Amendment cases may be broader than in other cases, this is simply because as a matter of law the ambit of negligence and inaccuracy is narrowed by constitutional limits upon the cause of action. Generically, however, such First Amendment review is no less a traditional exercise of judge powers over jury factual discretion than when a personal injury verdict is set aside because, after according credibility and factual inferences most favorably to the jury's finding, the factual conduct so proved nevertheless does not, as a matter of law, fall within the ambit of negligent conduct that constitutes actionable negligence.[6]

---

**6.** These concepts are not original with the writer. For instance, in Keeton, Creative Continuity in the Law of Torts, 74 Harv.L.Rev. 463, 500–01 (1962), Professor Keeton observes:

A system of supervision of application of a relatively general doctrinal formulation to particular cases involves another kind of choice also—whether the function of making evaluative findings essential to the application of the doctrinal formulation is to be treated as a question for the factfinder, usually the jury, or instead as a question for judicial decision. It is plain that the evaluative finding that characterizes conduct as negligent or not is to be made by the factfinder, with certainly no more and perhaps somewhat less judicial supervision than that over findings of physical fact. In some other areas of tort law, however, it appears to be the settled law that the function of evaluative finding is entirely judicial. These are illustrations: (1) the characterization of conduct as ultrahazardous or as falling within the principle of *Rylands v. Fletcher* where that principle is recognized; (2) in the law of malicious prosecution the characterization of grounds for instigating criminal proceedings as amounting to probable cause or not. In other areas of tort law,

responsibility for making evaluative findings is divided between judge and jury, or other factfinder, but on a different basis from that applying to the issue of negligence. These are examples: (1) The evaluative finding of unreasonable interference with use and enjoyment of land that constitutes nuisance is sometimes left to a jury, but in practice there has been considerably more judicial supervision in this area than in that of negligence. (2) *The function of characterizing a communication as defamatory is divided between judge and jury, a common formulation being that the judge determines whether the communication is capable of a defamatory meaning and the jury determines whether a defamatory meaning was conveyed.* (3) The function of making an evaluative finding that particular circumstances of publication give rise to a conditional privilege is assigned to the court, but the function of making an evaluative finding of abuse of the conditional privilege is assigned to the jury, with judicial supervision. In still other areas, the allocation of responsibility is yet quite nebulous. These are examples: (1) the finding that an interference with one's interests amounts to an actionable inva-

Thus, reflecting the constitutional dimension added in 1974 to the requirement for defamation liability to private persons by *Gertz v. Robert Welch, Inc., supra,* the Restatement of Torts 2d, Section 580B (1977) provides that (pertinently to present facts) the publisher "is subject to liability if, but only if, he ... knows that the statement is false and that it defames the other" or "acts negligently in failing to ascertain" these matters.[7] *See also* Reporter's Comment (c). As Reporter's Comment (k) ("Appellate review of determination of negligence") reflects, *Gertz*'s constitutional dimension added to private defamation action also imports an added degree of judge review of jury determinations of liability in such instances, founded upon constitutional rule:

> The determination of whether a defendant was negligent involves the application of the standard (what a reasonable person would do) to the facts that are found to exist in the particular case. This question is frequently called a fact issue and it is normally submitted to the jury. But the rule that liability cannot be imposed for a defamatory publication unless the defendant was negligent or more seriously at fault is a rule imposed by the Constitution. The application of the standard, therefore, necessarily involves a constitutional right, as in the case of the determination of whether the defendant acted in reckless disregard of the truth or falsity of a communication in a defamation action by a public official or public figure. (See § 580A, Comment g). As in that case, the determination is sub-

sion of privacy; (2) the finding that conduct of the defendant inducing a third person to break a contract with plaintiff is tortious in quality.
(Emphasis added.)

The emphasized quotation refers to a traditional division of judge-jury responsibility in defamation cases, prior to the additional constitutional restrictions on liability for defamation of private persons imposed by *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). See next succeeding paragraphs in text.

7. Restatement of Torts, Section 580B (1977) provides, in full:

ject to possible constitutional review all the way through the appellate process.

As the Supreme Court stated in another (actual malice) context than the present, fundamental First Amendment non-chilling considerations apply "where the alleged libel consists in the claimed misrepresentation of the gist of a lengthy governmental document" reported by a publication now sued for libel. *Time, Incorporated v. Pape,* 401 U.S. 279, 291, 91 S.Ct. 633, 640, 28 L.Ed.2d 45 (1971). "Where the document reported is so ambiguous as this one was, it is hard to imagine a test of 'truth' that would not put the publisher at the mercy of the unguided discretion of the jury." *Id.* These considerations equally apply in the present context, I believe, to judicial oversight over a trial jury's unwarranted factual determinations of falsity and negligence in what the court perceives to be overall a substantially truthful account of lengthy and somewhat technical litigation.

One final comment: On remittitur, the defendant publication was held liable for $255,000 in compensatory damages, an award affirmed by the majority, arising out of publication of the article of February 25, 1980, Appendix "A". May I suggest that, even had the article been printed free of the quibbles as to accuracy of which the plaintiff complains, the damages to his reputation and to his employment opportunities would have been as great? These damages primarily resulted from the published report and the factual circumstances reflected by litigation in New Jersey, and

**§ 580B. Defamation of Private Person**
One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
(a) Knows that the statement is false and that it defames the other,
(b) acts in reckless disregard of these matters, or
(c) acts negligently in failing to ascertain them.

the truthful report of charges against Levine levied in that litigation. The underlying cause of Levine's damages, thus, was his wrongful conduct in New Jersey, not the words used in reporting it when reported in the publication that, as is not questioned, was constitutionally protected if truthfully reporting the conduct.

(2)

On April 30, 1984, in *Bose Corporation v. Consumers Union of the United States, Inc.,* — U.S. —, 104 S.Ct. 1949, 80 L.Ed.2d 502, the Supreme Court clarified the standard of appellate review where First Amendment values are at issue. Admittedly, the issue there before the Court concerned a libel award against a "public figure" entity, where *New York Times v. Sullivan* applies, so as constitutionally to prohibit imposition of such awards unless clear and convincing evidence proves "actual malice". In *Bose,* the district court in a bench trial had held that this standard was met. The court of appeals reversed. The issue before the court was whether the clearly-erroneous standard of Fed.R.Civ.P. 52(a) inhibited appellate review of the central factual determination, *i.e.,* that actual malice was proved because the writer had actual knowledge of the trier-found falsity. The Court affirmed the exercise of independent review by the court of appeals, that had resulted in reversal of the libel judgment.

In holding that independent appellate review was constitutionally required insofar as the trier's conclusion was not founded on mere credibility evaluation, the Court stated "that in cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure 'that the judgment does not constitute a forbidden intrusion on the field of free expression.'" — U.S. at —, 104 S.Ct. at 1958. In *Bose Corporation,* the Court independently reviewed the testimony of the witness and reached a "factual" conclusion contrary to that of the district court as to whether the statement was falsely made

with knowledge of its falsity. In concluding that the expression was constitutionally protected, the Court incidentally noted, with relevance to issues before us, that "adoption of the language chosen was 'one of a number of possible rational interpretations' of an event," and that "[t]he choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella." — U.S. at —, 104 S.Ct. at 1966.

The Court justified the exercise of independent appellate review partly on the ground that the issue of whether expression fell outside the First Amendment's protection was a mixed question of law and fact, — U.S. at —, 104 S.Ct. at 1958, and partly because this determination presented a constitutional issue of whether the Constitution protected, or did not, the expression in question:

> The requirement of independent appellate review ... is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common law heritage. It reflects a deeply held conviction that judges—and particularly members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

— U.S. at —, 104 S.Ct. at 1965.

Although this expression of the Court and its specific holding relate only to appellate review of "actual malice" awards in First Amendment cases, it seems to me that the Court's rationale extends to appel-

late review of other instances in which First Amendment protection is sought to be denied to public expression of view or interpretation of events, whether it be an alleged libel against (as here) a private person or a public figure.

The Court notes "categories of communication and certain special utterances to which the majestic protection of the First Amendment does not extend," including among them "[l]ibelous speech." —— U.S. at ——, 104 S.Ct. at 1961. It then states:

In each of these areas, the limits of the unprotected category, as well as the unprotected character of particular communications, have been determined by the judicial evaluation of special facts that have been deemed to have constitutional significance. In such cases, the Court has regularly conducted an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited. Providing triers of fact with a general description of the type of communication whose content is unworthy of protection has not, in and of itself, served to eliminate the danger that decisions by triers of fact may inhibit the expression of protected ideas. The principle of viewpoint neutrality that underlies the First Amendment itself, see *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95–96 [92 S.Ct. 2286, 2289–2290, 33 L.Ed.2d 212] (1972), also imposes a special responsibility on judges whenever it is claimed that a particular communication is unprotected. See generally, *Terminiello v. Chicago*, 337 U.S. 1, 4 [69 S.Ct. 894, 895, 93 L.Ed. 1131] (1949).

—— U.S. at ——, 104 S.Ct. at 1961–62.

Immediately preceding this discussion, the Court had stated the fundamental reasons for the Constitution-based duty of the appellate court to determine whether constitutional protection of expression was offended by the liberal award in question:

When the standard governing the decision of a particular case is provided by the Constitution, this Court's role in marking out the limits of the standard through the process of case-by-case adjudication is of special importance. This process has been vitally important in cases involving restrictions on the freedom of speech protected by the First Amendment, particularly in those cases in which it is contended that the communication in issue is within one of the few classes of "unprotected" speech.

The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole.

—— U.S. at ——, 104 S.Ct. at 1961.

In *Bose Corporation*, the Court held that this constitutional duty imposed on all judges required that, on review, an appellate court must independently assess trier-found determinations, whether of trial judge or of jury, that (a) the burden of proof (convincing clarity in that case) was met to show that the expression was both (b) false and (c) knowingly so made within the meaning of the Constitution. As I read the Court's opinion, it reached a different conclusion as to each of these determinations by the trier.

In our similar constitutional duty to exercise independent review to determine whether "the communication at issue is within one of the few classes of 'unprotected' speech," *id.*, we must independently determine, after affording weight to all credibility determinations by the trier of fact, whether the present expression (a) was false *and* (b) was negligently made, as well as (c) that both these factual requirements were proved by a preponderance of the evidence. Exercising this duty imposed upon me by the Constitution, I find—for the reasons more fully stated in (1) *supra* —that the trial jury erred in all three respects.

*Conclusion*

Therefore, with the utmost respect for the view of my brethren in the majority, I must respectfully dissent.